J-S28045-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ESTATE OF JOSEPH TECCE, DECEASED | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: TANYA TECCE | : | No. 2593 EDA 2023 |

Appeal from the Decree Entered September 12, 2023
In the Court of Common Pleas of Delaware County Orphans' Court at
No(s): 040-2018

BEFORE: STABILE, J., MURRAY, J., and LANE, J.

MEMORANDUM BY LANE, J.: **FILED NOVEMBER 18, 2024**

Tanya Tecce ("Tecce") appeals from the decree which: (1) found she failed to establish that the will of her father, Joseph Tecce ("the Decedent"), resulted from undue influence; (2) granted nonsuit, on her citation *sur* appeal, in favor of Joseph Tecce, Jr. ("Brother"), Roseanna Giannone ("Giannone"), and Matthew Ferragame ("Executor"); and thus (3) directed that the Register of Wills probate Decedent's June 29, 2017 will ("June 2017 will"). We affirm.

The Decedent had two adult children: Tecce and Brother. Tecce has three children, who were the Decedent's only grandchildren. *See* N.T., 11/1/22, at 14. For approximately eighteen years until his death, the Decedent lived with his girlfriend, Giannone, who had three children. Executor is Giannone's son.

In the winter and spring of 2017, the Decedent took anti-anxiety medication. In March 2017, when the Decedent was seventy-eight years old, he underwent chemotherapy treatment, which caused congestive heart failure

and breathing difficulties. He contacted an attorney, John Conner, Esquire ("Attorney Conner"), to prepare a will. Attorney Conner visited the Decedent in his hospital room twice, a few days apart, and drafted a will ("March 2017 will"). This will bequeathed percentages of the Estate as follows: (1) thirty percent each to Brother and Giannone; (2) fifteen percent to Tecce; (3) fifteen percent to Tecce's adult son, Alessandro Tecce ("Alessandro");[1] and (4) the remaining ten percent to be divided equally among the Decedent's grandchildren. At trial, the Respondents presented an unsigned copy of this will.[2] Subsequently, the Decedent began a different chemotherapy treatment.

The parties do not dispute that approximately three months later, on Father's Day, June 18, 2017, Tecce and the Decedent had an argument at the Decedent's home. Giannone, Brother, and Brother's wife were present. At trial, Brother testified that the day after, the Decedent told him the reason for the argument: Tecce had previously asked the Decedent for money for

> the first and last month's deposit [to rent] a house in Narberth[.
> The Decedent considered this request] until finding out that
> [Tecce's] primary home in Clifton Heights was being foreclosed,
> which [she] did not tell him about. [Tecce] had been renting out
> her primary house and with that rent money, she was renting an
> additional apartment for herself in Wyn[ne]wood. [The Decedent]
> relayed he was upset that she had three properties and he didn't
> know. [Brother testified] that . . . his father and sister . . . had
> the blowup at the Father's Day dinner. . . . [Brother was not] sure
> of the amount, but was aware [the Decedent] was concerned

---

[1] At this time, Tecce's two other children were minors.

[2] Executor testified that he has not seen a signed copy of the March 2017 will. **See** N.T., 8/16/23, at 86.

- 2 -

about [Tecce's] financial responsibility and would complain about [Tecce] wanting money from him, especially after that Father's Day.

Orphans' Court Opinion, 2/28/24, at 24 (*citing* N.T., 8/16/23, at 99-100).

Giannone testified that in early June 2017, Tecce discussed a lease first with her, and then the Decedent. *See id*. at 13. Giannone did not know the amount of money Tecce asked the Decedent for, although she heard the Decedent ask Tecce how much money she had in her bank account. *See id*. at 13-14. After Tecce left, the Decedent "was upset." *Id*. at 13. Giannone further stated that the Decedent "would confide in telling her how [Tecce] needed to help herself," and he "consistently" felt this way "well before 2017." *Id.* Subsequently, the Decedent told Tecce over the phone "that he was not going to help her financially." *Id*. Later, during the Father's Day argument, Tecce was upset and told the Decedent, "[Y]ou never did anything for me. I always had to do it for myself," and "Happy f[—]ing Father's Day you a[--]hole." *Id*. at 14. The Decedent swore back at Tecce. *Id*. Giannone testified: the argument lasted less than "a few minutes;" afterward, the Decedent "was visibly shaking and crying;" and Giannone "was concerned she might have to call the hospital, but after some time and taking a Xanax, he calmed down." *Id*.

At trial, Tecce denied asking the Decedent for money during the Father's Day visit. She testified: she did not know "how the argument started;" the Decedent did not indicate "why he was angry with" her; and "[i]t just didn't

make sense [why] he was mad." N.T., 11/1/22, at 51-52. Tecce stated: the argument lasted "[a] minute or two;" the Decedent told her, "[F—] you;" Tecce "was shocked" and also said "[F—] you;" and then she and Alessandro, who was in the bathroom, left. *Id*. The Decedent did not appear to be angry at anyone else. *See id*.

Several days later, the Decedent contacted Attorney Conner to revise his will. Attorney Conner testified that he received a fax from the Decedent, setting forth amendments to his March 2017 will. The fax included the Decedent's handwritten note:

> Note: — My daughter has been a problem her entire life[.] On Father's Day she cussed me out after I spent 2½ months in the hosp. [*sic*]. My son[, his wife, and Giannone were] present.
>
> [Tecce] wanted me to bail her out financially — she has several degrees and should be able to get a job [and] support herself.
>
> This is not the first [*unintelligible*]. My daughter needs professional help.

Fax from the Decedent to Attorney Conner, 6/28/17, Respondents' Trial Exhibit R-3.

Attorney Conner talked with the Decedent, "to clarify the 'substantial changes'" and to discuss "some of the challenges that could result from" a new will. Orphans' Court Opinion, 2/28/24, at 20. Attorney Conner drafted the revised will, and the Decedent visited his office on June 29, 2017, to sign it. The Decedent reiterated the reasons for the changes were "[t]hat he had challenges with his relationship with his daughter," and he discussed the

Father's Day argument. *Id*. Attorney Conner stated the Decedent "was not agitated," "seemed to care about [Tecce], but was upset and disappointed and wanted to make sure she did not receive any of his estate," and further stated that Tecce "needed professional help." *Id*. at 21. Attorney Conner did not recall if he asked why the Decedent wished to make will revisions regarding his grandchildren. *See id*. at 20. He advised the Decedent "to get rid of the March 2017 will since it was revoked by the June 2017 will." *Id*. at 21.

The new, June 2017 will removed Tecce and the grandchildren as heirs, while increasing the testamentary shares to Brother and Giannone as follows: sixty percent to Brother and forty percent to Giannone. Additionally, the will named Giannone's son, Executor, as the executor.

Three months thereafter, on September 30, 2017, the Decedent passed away. The Register of Wills admitted the June 2017 to probate and granted letters testamentary.

On January 17, 2018, Tecce commenced the instant action by filing in the Orphans' Court a citation *sur* appeal from the admission of the June 2017 will to probate. Tecce averred that when the Decedent executed the will, he had a greatly impaired physical and mental condition and weakened intellect, and Giannone and/or Brother exerted undue influence on him.[3] Tecce named

_____

[3] Tecce's two minor children and Alessandro were also named petitioners in the petition for citation *sur appeal*. The record does not include any withdrawal by them from this matter, but some of Tecce's own subsequent
*(Footnote Continued Next Page)*

Brother, Giannone, and Executor (collectively, "the Respondents") as "parties of interest." Tecce's Petition for Citation *Sur* Appeal, 1/17/18, at 6-7.

On June 1, 2022, the Orphans' Court issued an order directing that all discovery be concluded one week before the November 1, 2022 trial date — or by October 25, 2022. On October 22, 2022, Tecce served on the Respondents a notice of intent to serve a subpoena on Decedent's primary care physician, James Minella, M.D. ("Dr. Minella"), for the production of medical records. **See** Respondents' Objections to Notice of Intent to Serve Subpoena, 11/9/22, at 1. As we discuss **infra**, pursuant to Pa.R.C.P. 4009.21(a), Tecce was required to wait at least twenty days before serving the subpoena on Dr. Minella.

Trial commenced as scheduled on November 1, 2022. On November 9, 2022, the Respondents filed objections to Tecce's notice of intent to serve a subpoena on Dr. Minella. The Respondents averred: (1) Tecce had already filed, in September 2022, a motion to extend the discovery deadline and to postpone trial, which the Orphans' Court denied; (2) Tecce knew Dr. Minella

_____

filings omitted some or all of her children as named petitioners, and at trial and in this appeal, Tecce proceeded on her own behalf only. **See also** Respondents' Brief at 9 (claiming that Alessandro and the two minor children, who have now reached majority, have declined to participate in this will contest).

Additionally, we note Tecce's petition also presented a claim that the Decedent lacked testamentary capacity. She withdrew this claim at trial. **See** N.T., 11/1/22, at 87.

treated Decedent and could have served the notice of intent "at any time during the almost five years in which the parties engaged in discovery;" and (3) the deadline for concluding discovery had passed. *Id*. at 1-2. Pertinent to the Orphans' Court reasoning, the Respondents requested the Orphans' Court to sustain their objections. Tecce did not file any response. On December 1, 2022, the Orphans' Court sustained the Respondents' objections. Tecce filed a motion for reconsideration, which the Orphans' Court denied.

Meanwhile, the Orphans' Court conducted additional trial proceedings on January 30, April 21, and August 16, 2023. Tecce, Brother, and Giannone testified as summarized above. Tecce further stated that after the Father's Day argument, she called and sent text messages to Giannone, but she did not respond. *See* N.T., 11/1/22, at 62. Tecce did not see the Decedent again until the week he died, after Brother advised her that the Decedent was in the hospital. *See id*. at 62-63.

Tecce sought to present Terrance Baker, M.D. ("Dr. Baker"), as an expert witness in the areas of geriatric medicine and weakened intellect. The Respondents objected to Dr. Baker's qualifications, arguing Dr. Baker did not talk to or examine the Decedent at any time, nor review any of his medical records from March through August 2017. *See* N.T., 8/16/23, at 52-53, 55. The Orphans' Court agreed and sustained the objection, thus precluding Dr. Baker from testifying. *See id*. at 74.

The Respondents presented the Decedent's diary, which included the following entries made in the weeks before and after the Father's Day argument: (1) "[M]y daughter wanted me to cash a CD;" (2) "[M]y daughter sent me a text full of lies blaming her failures on me. She needs professional help. Daughter is delusional;" (3) "Spoke with John Conner, attorney about changes to my will;" and (4) "I and [Giannone] drove up to the Conner Law Group in Jenkintown, PA. Made justified changes to my will. Nice day, was nice to run my car. Paperwork in office." Orphans' Court Opinion, 2/28/24, at 7-8. Tecce agreed that the latter entries were in the Decedent's handwriting, but she believed the diary was "unusual as [the Decedent misspelled] a lot of words[,] used wrong grammar and . . . he usually did not make mistakes like that." *Id*. at 6, 8.

Attorney Conner testified about his interactions with the Decedent, as discussed above. Attorney Conner also stated he "did not recommend [the Decedent] to receive a mental status exam prior to executing a will," nor inquired whether "Giannone had any influence on him in the decision to remove his daughter and grandchildren from his will." *Id*. The Orphans' Court summarized Attorney Conner's additional testimony as follows:

> [H]e did not believe [the Decedent] was under anyone's undue influence. [H]e did not believe [the Decedent] was influenced by . . . Giannone and her family because when [Attorney] Conner asked [the Decedent] about the increase to the Giannone and [Brother] shares, [the Decedent's] answers were consistent with what was in his fax. ["The Decedent] seemed strong. [He] didn't seem to me at any point in time during the two times I met with him that he would be intimidated or unduly influenced by

anybody.  He was his own man.  His body was beat up, but he was strong." . . .

*Id*. at 21 (*citing* 4/21/23, at 70-72).   Attorney Conner also stated the Decedent "was in better health" at their June 2017 meeting than their March meetings.  *Id*. at 20.

Finally, we recount that Attorney Conner testified he was permanently disbarred from the practice of law, following his federal jury convictions of wire fraud and obstruction of justice.  Attorney Conner used a client's credit card without her permission, when he had a gambling addiction, and he committed his crimes at "the same time that he was handling some of [the Decedent's] affairs, in March and April 2017."  *Id*. at 16.

Following the presentation of the evidence, the Respondents made an oral motion for a compulsory nonsuit, arguing that Tecce failed to present sufficient evidence establishing direct or indirect undue influence on the Decedent.  *See* N.T., 8/16/23, at 125-31.  Subsequently, on September 12, 2023, the Orphans' Court granted the motion for nonsuit, and thus directed the Register of Wills to probate the Decedent's June 2017 will.  Tecce filed a timely notice of appeal and she and the Orphans' Court have complied with Pa.R.A.P. 1925.

Tecce presents the following issues for our review:

A. Did the Court commit an error of law and/or abuse its discretion when it granted Objections to [Tecce's] Notice of Intent to Serve Subpoena on December 1, 2022, based solely upon [Tecce] not filing a response to the Objections[?]

B. Did the Court abuse its discretion when it denied [Tecce's] Petition for Reconsideration/Motion *Nunc Pro Tunc* on January 6, 2023[?]

C. Did the Court commit an error of law and/or abuse its discretion when it sustained the [Respondents'] objection to the qualifications of [Tecce's] medical expert, [Dr.Baker,] as to [the] Decedent's weakened intellect[?]

D. Did the Court err when it granted the [Respondents'] oral motion for non-suit when [Tecce] had shown clear and convincing evidence of both direct and indirect undue influence[?]

Tecce's Brief at 5 (issues renumbered).

In her first two issues, Tecce avers the Orphans' Court erred and violated Pa.R.C.P. 4009.21 in sustaining the Respondents' objections to her notice of intent to serve a subpoena on the Decedent's primary care physician. "When reviewing the propriety of a discovery order, this Court determines whether the trial court committed an abuse of discretion." ***Virnelson v. Johnson Matthey Inc.***, 253 A.3d 707, 713 (Pa. Super. 2021). "The purpose of the discovery rules is to 'prevent surprise and unfairness and to allow a fair trial on the merits.'" ***Id***. (citation omitted).

Tecce's arguments implicate the interpretation of rule 4009.21. "[W]hen the issue before us involves 'the proper interpretation of the language of our rules of civil procedure,' the question is a pure matter of law, and 'our standard of review is *de novo*.'" ***FedEx Corp. Servs. v. Costume Gallery, Inc.***, 320 A.3d 129, 132 (Pa. Super. 2024) (citation omitted). Former

Pennsylvania Rule of Civil Procedure 127, which was in effect at the time of the objections,[4] addressed the interpretation of the rules:

>        (a) The object of all interpretation and construction of rules is to ascertain and effectuate the intention of the Supreme Court.
>
>        (b) Every rule shall be construed, if possible, to give effect to all its provisions.  When the words of a rule are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit.

Pa.R.C.P. 127(a)-(b), *rescinded* Nov. 3, 2023, *eff.* Jan. 1, 2024.  Additionally, rule 126 provides: "The rules shall be liberally applied to secure the just, speedy, and inexpensive determination of every action or proceeding to which they are applicable."  Pa.R.C.P. 126(a).

Pennsylvania Rule of Civil Procedure 4009.21 governs a subpoena upon a non-party for the production of documents:

>        (a) A party seeking production from a person not a party to the action shall give written notice to every other party of the intent to serve a subpoena at least twenty days before the date of service.  . . .
>
>        * * * *
>
>        (c) Any party may object to the subpoena by filing of record written objections and serving a copy of the objections upon every other party to the action.
>
>        (d)
>
>        (1) If objections are received by the party intending to serve the subpoena prior to its service, the subpoena

---

[4] Former rule 127 was rescinded effective January 1, 2024, and adopted with some amendments as current Pennsylvania Rule of Judicial Administration 108.  **See** Pa.R.J.A. 108(a)-(c).

shall not be served. ***The court upon motion shall rule upon the objections and enter an appropriate order.***

> *Note*: Subdivision (a) of this rule provides a twenty-day notice period during which a subpoena may not be served.
>
> (2) If objections are not received as provided in paragraph (1), the subpoena may be served subject to the right of any party or interested person to seek a protective order.

Pa.R.C.P. 4009.21 (a), (c), (d)(1)-(2) (emphasis added).

In her first issue, Tecce avers the Orphans' Court erred and abused its discretion in sustaining the Respondents' objections to her notice of intent to serve a subpoena on Dr. Minella. First, Tecce avers the court's ruling was premature. She reasons that under rule 4009.21(d)(1), a trial court may only rule on objections "after a motion to rule on the objections has been filed." Tecce's Brief at 12 (emphasis omitted) (*citing* ***Piroli v. Lodico***, 909 A.2d 849 (Pa. Super. 2006)). Here, Tecce maintains, ***she*** did not file any such motion. Additionally, on the merits, Tecce maintains that: (1) she "did not learn the identity of [the] Decedent's primary care physician until the deposition of the interested witnesses and parties which were completed immediately prior to the first date" of trial; and (2) the production of the medical records would not have surprised or prejudiced the Respondents, who "had complete access to the records." ***Id***. at 13-14. In Tecce's related second issue, she contends the Orphans' Court erred in denying her motion for reconsideration.

In sustaining the Respondents' objections, and denying Tecce's subsequent motion for reconsideration, the Orphans' Court reasoned that her

notice of intent to serve the subpoena was untimely. Tecce commenced this action in January 2018. The Orphans' Court pointed out that more than four years later, it initially directed the parties to complete discovery by July 27, 2022, with trial scheduled for August 3, 2022. However, as summarized above, in June 2022 the Orphans' Court postponed the discovery deadline to October 25, 2022, for a new November 1, 2022 trial date. The court found: "Ample time was afforded both parties to be prepared for trial." Orphans' Court Opinion, 2/28/24, at 28. Three days before the discovery deadline, however, Tecce served the Respondents with notice of her intent to subpoena Dr. Minella. Pursuant to rule 4009.21(a), Tecce then had to wait twenty days before serving the subpoena. **See** Pa.R.C.P. 4009.21(a). The Orphans' Court reasoned: "By the time . . . the subpoena could possibly have been effectuated, the discovery deadline . . . would have terminated." Orphans' Court Opinion, 2/28/24, at 28 (unnecessary capitalization omitted). The court found that ruling in Tecce's favor "would have been an unfair prejudice to the Respondents," as well as violative of the discovery deadline order. **Id**. at 27. With respect to Tecce's claim that a court may rule on objections only upon a party's motion, the Orphans' Court found that a party did file such a motion — the Respondents' objections "specifically ask[ed] for the court to respond." **Id**. at 28 (unnecessary capitalization omitted).

After review of the record and relevant law, we determine the Orphans' Court did not abuse its discretion. **See Virnelson**, 253 A.3d at 713. First,

we disagree with Tecce's contention that under rule 4009.21, the court was precluded from ruling on the Respondents' objections unless **she** motioned for the court to rule on it. Our review of the relevant law reveals no decisional authority addressing this issue.[5]

Next, we consider the plain language of rule 4009.21. As stated above, the Orphans' Court found one party — the Respondents — did request the court to rule on the objections, and this satisfied the requirement for a motion. On appeal, Tecce does not address this reasoning. Our review of rule 4009.21 shows the only mention of a "motion" appears in subsection (d)(1): "If objections are received by the party intending to serve the subpoena prior to its service, the subpoena shall not be served. The court **upon motion** shall rule upon the objections and enter an appropriate order." Pa.R.C.P. 4009.21(d)(1) (emphasis added). Saliently, although the first sentence focuses on the subpoenaing party, the second sentence, which includes the reference to a "motion," does not identify which party shall file it. **See id**. In the absence of any such language, we decline to read a requirement into the rule. **See** Pa.R.C.P. 127(b), *rescinded* (providing that "[w]hen the words of a rule are clear and free from all ambiguity, the letter of it is not to be

_____

[5] We reject Tecce's reliance on **Piroli**, 909 A.2d 849. **Piroli** made one passing reference to rule 4009.21 — in summarizing that the plaintiff filed a notice of intent to serve a subpoena on a medical treatment facility. **See Piroli**, 909 A.2d at 847. However, there was no discussion of the rule's requirement for a motion; instead, the issue concerned the applicability of the Peer Review Protection Act, 63 P.S. §§ 425.1-425.4. **See id**.

disregarded under the pretext of pursuing its spirit"). Accordingly, we conclude rule 4009(d)(1): (1) provides merely that a trial court, "upon motion," shall rule on the objections; but (2) does not identify which party shall file this motion. **See** Pa.R.C.P. 4009.21(d)(1). As stated by the Orphans' Court, the final line of the Respondents' objections was a request to the court to "sustain" their objections, and this request satisfied the requirement for a "motion."[6] **See** Objections to Notice of Intent to Serve Subpoena at 3.

On the merits, we find no abuse of discretion in the Orphans' Court finding that Tecce's notice of intent to serve the subpoena was untimely. **See** **Virnelson**, 253 A.3d at 713. Tecce does not dispute that if she had been permitted to serve the subpoena on Dr. Minella, after the requisite twenty-day waiting period, the discovery deadline would have already passed. While Tecce maintained that she did not learn the name of the Decedent's primary care physician until depositions of unnamed "interested witnesses and parties," Tecce's Motion for Reconsideration, 12/16/22, at unnumbered 3, the

---

[6] We also conclude there is no merit to Tecce's additional arguments — that she was not required to file a response to the Respondents' objections because the objections were "not filed in the form of a motion for protective order that contained a notice to respond directed to" her. Tecce's Brief at 12-13.

Rule 4009.21 makes one reference to a protective order in subsection (d)(2): "**If objections are not received** [by the subpoenaing party], the subpoena may be served subject to the right of any party or interested person to seek a **protective order**." Pa.R.C.P. 4009.21(d)(2) (emphases added). Here, Tecce has made no claim that she did not receive the Respondents' objections. Accordingly, subsection (d)(2) is not invoked and the seeking of any protective order is not relevant.

- 15 -

Respondents averred: (1) "[s]ince January 2019, the parties have engaged in extensive discovery, including the production of thousands of pages of documents, . . . depositions of party and non-party witnesses, and expert reports;" and (2) in any event, Tecce "knew of Dr. Minella's treatment of [the] Decedent before his death." Respondents' Objections to Notice of Intent to Serve Subpoena at 1-2. Upon this record, we do not disturb the Orphans' Court finding, that permitting the subpoena on Dr. Minella after the discovery deadline would have prejudiced the Respondents. **See Virnelson**, 253 A.3d at 713. In light of all the foregoing, we find no abuse of discretion in the Orphans' Court sustaining the Respondents' objections, nor in denying Tecce's motion for reconsideration. No relief is due on Tecce's first and second issues.

In her third issue, Tecce asserts the Orphans' Court abused its discretion in sustaining the Respondents' objections to the qualifications of her proposed medical expert, Dr. Baker. We consider the applicable standard of review:

> Our standard of review of a trial court's decision to exclude expert testimony is very narrow.
>
> The admission or exclusion of evidence, including the admission of testimony from an expert witness, is within the sound discretion of the trial court. . . . To constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party.

**In re Estate of Byerley**, 284 A.3d 1225, 1239 (Pa. Super. 2022) ("**Estate of Byerley**") (citation omitted). "Generally, relevant evidence is admissible and irrelevant evidence is in admissible. Evidence is relevant if it has "any

- 16 -

tendency to make a fact [of consequence] more or less probable than it would be without the evidence." *Id*. (*citing* Pa.R.E. 401).

In *Estate of Byerley*, a son challenged the probate of his ninety-one year old father's will, which granted the father's companion a life estate in his home. *See id*. at 1233. The son argued the companion exerted undue influence over his father. *See id*. The son sought to present, as both a fact and expert witness, a psychologist who examined the father sixteen months after the execution of the will and twenty months after the father first met with the attorney who drafted the will. *See id*. at 1232, 1240. The companion filed a motion *in limine* to exclude the psychologist's testimony and report, citing the long passage of time between the will execution and the examination. *See id*. at 1233. The Orphans' Court rejected the son's response — that the psychologist's "testimony would still be relevant despite [this] timing" — and granted the motion *in limine*. *Id*. at 1234.

On appeal, this Court affirmed the Orphans' Court's ruling. *See id*. at 1240. We first noted that in "ascertaining the testator's intention, a will is to be construed as of the date of its execution." *Id*. (citation omitted). We also considered: "To the extent that weakened intellect may be 'proven through evidence more remote in time from the will's execution,' we understand the term 'remote' to reference a timeframe *prior* to the will's execution, not after, as remote evidence of undue influence would precede the will's execution." *Id*. (citation omitted and emphasis in original). This Court then concluded

that the record supported the Orphans' Court finding — that any testimony by the psychologist, as either a fact or expert witness, "would not have been relevant to the Orphans' Court determination as to whether [the father] had a weakened intellect because his single evaluation occurred sixteen months after the date of the [w]ill's execution and twenty months after [the father] first met with" the scrivener attorney. *Id*.

We reiterate that in this matter, Dr. Baker did not talk to or examine the Decedent, nor review any of his medical records in the months surrounding his March 2017 and June 2017 wills. *See* N.T., 8/16/23, at 47. Dr. Baker did review the Decedent's medical records from September 2017, the month he passed away, but Dr. Baker did not talk to any of the treating physicians. *See id*. at 50. Additionally, Dr. Baker reviewed medical records concerning the Decedent's two prior surgeries, at unspecified times, and he reviewed deposition transcripts provided by Tecce's attorney. *See id*. at 33, 47-48.

On appeal, Tecce challenges the Orphans' Court reasoning that: (1) Dr. Baker was not qualified because he did not examine or have direct contact with Decedent; and (2) Dr. Baker did not review "medical records contemporaneous with the time period surrounding" the execution of the June 2017 will. Tecce's Brief at 15. Tecce avers the Orphans' Court reasoning "more properly addresse[d] the weight to be given to the testimony, not its admissibility." *Id*. at 16.

In precluding Dr. Baker as an expert witness, the Orphans' Court found that the information he reviewed would not support an expert opinion on the Decedent's mental state at the time he executed the June 2017 will. **See** N.T., 8/16/23, at 79. The court reasoned that Dr. Baker relied on medical history not related to that time period, and indeed, he could not even state the dates of the Decedent's prior surgeries. **See id**. at 78.

After our review, we conclude the Orphans' Court did not abuse its discretion in precluding Tecce's presentation of Dr. Baker as an expert witness. **See Estate of Byerley**, 284 A.3d at 1239. The relevant period for considering whether the Decedent had a weakened intellect was the time when he executed the June 2017 will. However, Dr. Baker did not review any medical records from that period. Additionally, whereas the psychologist in **Estate of Byerley** examined the father sixteen months after he executed his will, here Dr. Baker did not examine or even talk to the Decedent at any time. **See id**. at 1240. On this record, we conclude the Orphans' Court did not abuse its discretion in finding Dr. Baker's testimony would not be relevant to Tecce's claim — that the Decedent had a weakened intellect when he executed the June 2017 will. Accordingly, we determine no relief is due on Tecce's third issue.

In Tecce's final issue, she avers the Orphans' Court erred in finding she did not present sufficient evidence of undue influence on the Decedent and in

granting nonsuit in favor of the Respondents. With respect to a nonsuit, we consider:

> A motion for compulsory non-suit allows a defendant to test the sufficiency of a plaintiff's evidence and may be entered only in cases where it is clear that the plaintiff has not established a cause of action; in making this determination, the plaintiff must be given the benefit of all reasonable inferences arising from the evidence. . . .

> "When we review the grant of a non-suit, we must resolve all conflicts in the evidence in favor of the party against whom the non-suit was entered. . . . "

***Gregury v. Greguras***, 196 A.3d 619, 625 (Pa. Super. 2018) (citations omitted).

We also consider the applicable standard of review for an Orphans' Court adjudication of an appeal from probate:

> In a will contest, the hearing judge determines the credibility of the witnesses. The record is to be reviewed in the light most favorable to appellee, and review is to be limited to determining whether the [Orphans' C]ourt's findings of fact were based upon legally competent and sufficient evidence and whether there is an error of law or abuse of discretion. . . .

> We "will not lightly find reversible error and will reverse an Orphans' Court decree only if the [O]rphans' [C]ourt applied an incorrect rule of law or reached its decision on the basis of factual conclusions unsupported by the record."

> The Pennsylvania Supreme Court has repeatedly held that the "best evidence of a testator's intent is the testamentary document itself and the testator's arrangements with his attorney."

***Estate of Byerley***, 284 A.3d at 1236-37 (citations omitted).

This Court has stated:

- 20 -

Testamentary capacity exists when the testator has intelligent knowledge of the natural objects of his bounty, the general composition of his estate, and what he or she wants done with it, even if his memory is impaired by age or disease. "Neither old age, nor its infirmities, including untidy habits, partial loss of memory, inability to recognize acquaintances, and incoherent speech, will deprive a person of the right to dispose of his own property." In determining testamentary capacity, a greater degree of proof of mental incapacity is required than would be necessary to show the inability to conduct one's business affairs. Finally, testamentary capacity is to be ascertained as of the date of execution of the contested document.

*In re Estate of Smaling*, 80 A.3d 485, 494 (Pa. Super. 2013) ("*Estate of Smaling*") (citations omitted).

Our Supreme Court has addressed undue influence as follows:

The word "influence" does not refer to any and every line of conduct capable of disposing in one's favor a fully and self-directing mind, but to control acquired over another that virtually destroys his free agency. . . . In order to constitute undue influence sufficient to void a will, there must be imprisonment of the body or mind . . . fraud, or threats, or misrepresentations, or circumvention, or inordinate flattery or physical or moral coercion, to such a degree as to prejudice the mind of the testator, to destroy his free agency and to operate as a present restraint upon him in the making of a will.

*Id*. at 498 (citation omitted).

. . . Once the proponent of the will in question establishes the proper execution of the will,[] a presumption of lack of undue influence arises; thereafter, the risk of non-persuasion and the burden of coming forward with evidence of undue influence shift to the contestant. The contestant must then establish, by clear and convincing evidence, a *prima facie* showing of undue influence by demonstrating that: (1) the testator suffered from a weakened intellect; (2) the testator was in a confidential relationship with the proponent of the will; and (3) the proponent receives a substantial benefit from the will in question. Once the contestant has established each prong of this tripartite test, the burden shifts

again to the proponent to produce clear and convincing evidence which affirmatively demonstrates the absence of undue influence.

*Id*. at 493 (citations and footnote omitted).

With respect to the prong of confidential relationship, this Court has explained:

[A] confidential relationship exists "when the circumstances make it certain that the parties did not deal on equal terms, but on the one side there is an overmastering influence, or, on the other, weakness, dependence or trust, justifiably reposed." "A confidential relationship is created between two persons when it is established that one occupies a superior position over the other — intellectually, physically, governmentally, or morally — with the opportunity to use that superiority to the other's disadvantage." . . .

*Id*. at 498 (citations omitted).

Tecce asserts the Orphans' Court erred in granting the Respondents' motion for non-suit, where she presented clear and convincing of direct undue influence. In support, Tecce contends: (1) "[t]he record evidence was clear that [she] was an active participant in [Decedent's] life" and medical care; (2) she and Decedent had an argument on Father's Day, in which they "cursed at each other;" (3) "Giannone testified that Decedent's emotions and rage were so elevated that he was convulsing so much that she considered calling an ambulance;" (4) Giannone admitted that in the following days, she "parrot[ed] back to the Decedent reasons why [Tecce] was ungrateful, entitled[,] and spoiled[;]" (5) when Giannone overheard Decedent contacting Attorney Conner to revise his will, Giannone "exploited [his] vulnerability" and "made certain that [he] remained fixed in his anger" at Tecce; (6) Giannone drove

Decedent to Attorney Conner's office, and (7) Giannone continued "to isolate Decedent from [Tecce] until the very last week of his life and [he] was hospitalized and bedridden." Tecce's Brief at 18-19 (unnecessary capitalization omitted). Finally, Tecce contends that Giannone's share of Decedent's estate "substantially increased" under the new will. *Id*. at 19.

Additionally, Tecce acknowledges the Orphans' Court "put significant weight on" Attorney Conner's testimony, but asserts his "testimony should not have been accepted." *Id*. Tecce maintains that Attorney Conner has been disbarred from the practice of law and convicted of wire fraud and obstruction of justice, for "crimes stemm[ing] from a . . . gambling addiction during the same period he was handling Decedent's affairs."[7] *Id*.

We first conclude no relief is due on Tecce's claim that the Orphans' Court should not have accepted or given weight to Attorney Conner's testimony. As stated above, in a will contest, the Orphans' Court determines the credibility of the witnesses, and we do not disturb its findings. *See Estate of Byerley*, 284 A.3d at 1236-37. The Orphans' Court was free to weigh the circumstances of Attorney Conner's federal convictions and disbarment, as

_____

[7] Tecce further contends the Orphans' Court improperly excluded expert medical testimony by Dr. Baker, which would have showed *indirect* undue influence. Tecce's Brief at 19. As we have concluded above that no relief is due on Tecce's challenge to the exclusion of Dr. Baker's testimony, this claim is similarly meritless.

well as his testimony about the Decedent and their interactions in preparing the two wills. The court concluded Attorney Conner

> ***credibly and convincingly testified***, in great detail, that during his representation of [the Decedent] prior to and on the date of the June 2017 Will's execution, [the] Decedent showed no signs of weakened intellect, including manifestations of confusion, forgetfulness or disorientation; appeared to be of sound mind; and was able to understand completely and freely what he was doing.

Orphans' Court Opinion, 2/28/24, at 32 (emphasis added). On appeal, we do not disturb these findings.

With respect to the merits of Tecce's undue influence claim, we observe that the Honorable Kathrynann Durham has authored a comprehensive and well-reasoned opinion, with citations to the record and relevant authority. After a careful review of the parties' briefs and the certified record, we affirm on the basis of the Orphans' Court opinion as to Tecce's undue influence claim. ***See*** Orphans' Court Opinion, 2/28/24, at 3-22 (reviewing the extensive testimony by Tecce, Giannone, and Attorney Conner as to their interactions with the Decedent and observations of his mental state), 32 (finding Attorney Conner was credible in testifying that the "Decedent showed no signs of weakened intellect . . . and was able to understand completely and freely what he was doing"), 40 (finding that Tecce's only testimony regarding the Decedent's alleged weakened intellect was that he "was misspelling a lot of words[,] used wrong grammar and that he usually did not make mistakes like that"), 41-42 (finding "there was no evidence presented that [the] Decedent was in a state of persistent confusion, forgetfulness, or disorientation[, nor

that he] was unable to manage his affairs," and further finding "there was a lack of clear and convincing evidence" of a confidential relationship between the Decedent and Giannone), 42 (acknowledging that while Tecce "is upset" with the provisions of the June 2017 will, a parent owes no obligation to his children to leave them property, and concluding that "[w]ithout clear and convincing evidence that undue influence existed, the Orphans' Court must honor [the] Decedent's voluntary decision regarding the June 2017 Will"). In light of the Orphans' Court thorough review and apt discussion of the relevant law, we do not disturb the court's finding that Tecce failed to present sufficient evidence to support her undue influence claim. *See Gregury*, 196 A.3d at 625; *see also Estate of Smaling*, 80 A.3d at 493.

As we conclude that no relief is due on any of Tecce's issues, we affirm the Orphans' Court decree granting nonsuit in favor of the Respondents and directing that the Decedent's June 2017 will be probated. The parties are instructed to attach a copy of the Orphans' Court February 28, 2024 opinion to all future filings of this memorandum decision.

Decree affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 11/18/2024

- 25 -



IN THE COURT OF COMMON PLEAS,
DELAWARE COUNTY, PENNSYLVANIA
ORPHANS' COURT DIVISION

IN RE: Estate of Joseph Tecce, Deceased  :  No. 40-2018

James Lutz, Esquire – Attorney for Appellant Tanya Tecce
Karl Prior, Esquire and Zoey Wright, Esquire – Attorneys for Appellees Joseph C.
Tecce, Matthew Ferragame and Roseanna Giannone

DURHAM, J.                                    DATE: 2/26/24

## OPINION

Appellant/Petitioner Tanya Tecce ("Tanya") seeks to review the Interlocutory
Decrees entered on December 1, 2022 and January 6, 2023, ruling as to expert
qualifications on August 16, 2023 and the Orphans' Court Decree dated September 12,
2023 wherein upon consideration of the Respondent's (Matthew Ferragame, Joseph V.
Tecce, Jr., and Roseanna Giannone) Oral Motion for Non-Suit and the evidence
presented at the hearings held on November 1, 2022, January 30, 2023, April 21, 2023,
and August, 16, 2023, It Is Hereby ORDERED and DECREED that Said Motion is
GRANTED. In support of its ruling, The Orphans' Court has found the following facts:
(1) Petitioner has failed to establish by clear and convincing evidence that the June 29,
2017 Will was procured by direct or indirect undue influence from Ms. Giannone. (2)
There is a lack of clear and convincing evidence that Joseph Tecce, 'Decedent,'
suffered from a 'weakened intellect' at or around the time the June 29, 2017 Will was
signed and executed. (3) Based upon the evidence presented, Decedent had
testamentary capacity when he executed the June 29, 2017 Will, and said Will is valid.

1

104

Pursuant to the provisions set forth in *Clark's Estate*, 334 A.2d 628 (Pa. 1975), the Orphans' Court Grants the Motion for Non-suit. It is further ORDERED and DECREED that Decedent's Will dated June 29, 2017 SHALL be probated by the Delaware County Office of the Register of Wills. On October 10, 2023, Tanya filed a Notice of Appeal. On October 13, 2023, the Orphans' Court ordered, pursuant to PA. R.A.P. 1925(b), to file a Concise Statement of Matters Complained of On Appeal. On October 26, 2023, Tanya filed the aforementioned Statement.

## FACTUAL HISTORY

On June 29, 2017, Decedent executed a Last Will and Testament (the "June 2017 Will") written by attorney and scrivener, John K. Conner ("Mr. Conner") wherein Tanya and the grandsons were removed and disinherited from the Will and shares were increased to Tecce Jr., Ms. Giannone and Ferragame.

At the November 1, 2022 hearing, parties stipulated to the fact the June 29, 2017 Will was executed in front of two witnesses and a notary and to the certification of the probate record. *See* Notes of Testimony, November 1, 2022 ("NT" 11/1/22" at pg. 9). Tanya Tecce ("Tanya") testified that the Melrose Street residence in East Lansdowne was owned by her father, Mr. Joseph Tecce, Senior ("Mr. Tecce") which he owned until the time of his death and would use it as an office for the shared family business, Nyack Corporation. Id. at 11- 12. Tanya testified she believed the Nyack Corporation, was the sole income for Mr. Tecce and that her brother eventually participated in the business as well. Id. at 21-22.

2

Tanya testified that from January through March 2017, seventy-five percent (75%) of visits with her father were in the hospital. Id. at 24-25. Tanya identified Exhibit P-1 as a Christmas card with Mr. Tecce's handwriting and that she received it for Christmas 2016. *See* Exhibit P-1, Id. at 26. Tanya testified that from January through March 2017, she stayed overnight at the hospitals with Mr. Tecce and that a schedule was created between she, her brother, and "Roe", Mr. Tecce's girlfriend whose name is Rosanna Giannone ("Ms. Giannone"). Id. at 26-28.

Tanya testified that at one Sunday dinner in April 2017, the topic of money, specifically a CD, came up. Ms. Giannone stated it was sitting there collecting interest. She testified she does not recall any other discussion at family dinners regarding Mr. Tecce's estate. Id. at 33. Tanya testified Mr. Tecce did not talk about his Will. Id. at 34.

Tanya testified Mr. Tecce bought the house on Nicholas street in 2000 and he eventually moved in there with Ms. Giannone, his girlfriend. Id. at 34-35. Tanya testified the Sunday dinners were usually at the Nicholas house and Ms. Giannone was present for most of them. Tanya testified Mr. Tecce enjoyed the Sunday dinners too and wrote about them in his journal. Id.

Tanya testified that once Mr. Tecce returned home from the hospital in April 2017 they would text each other. Id. Tanya testified that page 2 of the Exhibit P-8 had text messages that between herself and Mr. Tecce. Mr. Tecce texted her stating "Tanya, are you okay?" on Tuesday, April 4th. *See* Exhibit P-8 Texts screenshots. Id. at 37-39. Tanya testified that May 13, 2017, Mr. Tecce sent her a text asking "Will I see you tomorrow" and that Tanya was trying to make plans on Mother's Day and that they did briefly see each other on Mother's Day. *See* Exhibit P-8. Id. at 41- 42. Tanya testified

3

that she received a voicemail from Tecce Jr asking her to spend less time there [the Nicholas residence]. Id. at 43.

Tanya testified that she texted Mr. Tecce on Father's Day, June 17, 2017. She stated that "im going to come by tomorrow, okay, 3:00 pm. Okay" and Mr. Tecce responded "Okay see you then". She then testified to sending a meme via text prior to arriving that said "Happy Father's Day, number 1 dad". Id. at 47-48. Tanya testified that upon arriving on Father's Day she noticed that Ms. Giannone seemed mad as did Mr. Tecce and the atmosphere was very tense. Id. at 49. Tanya testified that she thought Mr. Tecce said something along the lines of not knowing when she would arrive and wasn't sure if he had said anything to Tanya's son, Alessandro, and that Mr. Tecce didn't give either of them hugs. Id.

Tanya testified there was an argument on Father's Day and that it lasted a minute or two while sitting at the dining room table. Tanya doesn't recall Ms. Giannone sitting, but does believe Tecce Jr. and his wife were. Alessandro was in the bathroom and her other sons had left. She did not recall how the argument started and denied asking for any money from Mr. Tecce on Father's Day. Id. at 50-51. Tanya testified that she remembers cursing at Mr. Tecce and Mr. Tecce cursing at her during the Father's Day argument. She recalls him saying 'fuck you' and she was shocked and said 'fuck you' back. Id. Tanya testified that prior to saying those words, Mr. Tecce did not say he was angry with her. He did not seem mad at anyone else in the room. Id. at 52. Tanya testified that during the heated argument, Mr. Tecce did not bring up his grandsons. Id.

Tanya testified regarding the June 21st text that she sent, she did not bring up money or not getting financial assistance from Mr. Tecce. Id. at 57. Tanya testified the

4

text Mr. Tecce wrote back stated "You need serious professional help. Look at yourself. I only asked you and you are in complete denial. I will pray for you". See Exhibit P-8. Id. Tanya testified the next time she saw her father, Mr. Tecce, was on September 24th and he passed away on September 30th. Id.

Tanya testified that she was aware of a healthcare power of attorney ("POA") where Mr. Tecce name her as "the person". See Exhibit P-3 "POA photocopy", Id. at 60. Tanya testified she remembers Roe (Mrs. Giannone) and possibly Tecce Jr. when the photograph of the POA was taken at Moss Rehab. Id. Tanya testified she remembers Mr. Tecce informing her about a POA and that he designated her to serve as his agent and she had not seen the POA since the photograph taken on March 27, 2017. Id.

Tanya testified on the Father's Day argument, Mr. Tecce did not involve any of his grandsons in the argument. Id. at 61-62. Tanya testified after the Father's Day argument, Ms. Giannone did not try reaching out to her, but Tanya attempted to call and text and no response was ever received back. Id. Tanya testified that Tecce Jr., sent her a text on September 24 stating that she should come see Mr. Tecce. She stated that Tecce Jr told her that it was not urgent, but that she should get there and "he said don't tell anyone - - don't tell them I told you". Id. at 63. Tanya testified that when she first walked in at the hospital on September 24th, Mr. Tecce told her "I wrote you and the boys out of the will". Id. at 63. Tanya testified that in Mr. Tecce's lifetime she did not see any copies of any Will. Id.

Tanya testified she has learned that Mr. Tecce had kept a daily journal in 2017 and recognized Mr. Tecce's handwriting when presented with it as an exhibit. She testified that she had reviewed it and it accurately reflects the events going on in Mr.

5

Tecce's life in the year 2017. The parties stipulated that it was indeed Mr. Tecce's journal. *See* Exhibit P-4 "Tecce Diary". Id. at 64-66. Tanya testified the journal ("diary") had been accurate in terms of events of Mr. Tecce's life, including medical health (medications, hospitalizations, and some side effects from medications; such as chemotherapy causing difficulty with breathing, edema, swelling, and dizziness) and interactions (including the argument on Father's Day). Id. at 72.

Tanya testified as a prelude to the June 18 diary entry, she did read the other entries regarding Mr. Tecce and her discussing money in early June. Tanya testified the money discussed was regarding her Jeep's repairs that she paid for. Tanya read the diary entry as "My daughter exploded because will not give her money. She ruined the day for my son and H/W, Rosanna and me and Alex her son." *See* Exhibit P-4. Id. at 73-75.

Tanya testified she did not agree with the journal and that she did not 'explode' and did not ask for money. Id. Tanya testified she did find the journal unusual as Mr. Tecce was misspelling a lot of words and used wrong grammar and that he usually did not make mistakes like that. In her years that she worked with him, he wrote down stuff for her and she was used to his writing. Id. at 75-76.

Tanya testified that there were numerous disinheritances that Mr. Tecce made in his wills regarding Tanya and her sons; and that there are other times, in general, that Mr. Tecce did not disinherit Tanya, but would decrease the inheritance. Tanya testified the inheritance and amounts went back and forth. Id. at 94 – 116. Tanya testified Mr. Tecce's 2017 diary was entirely written by Mr. Tecce and she had the opportunity to go through the diary page-by-page to confirm. *See* Exhibit P-4. Id. at 117. Tanya did not

6

dispute the diary's accuracy as it reports the fact of interactions and visits, between her and her father. Id. at 117-118.

Tanya testified "usually" the Sunday family dinners occurred around 3:00 pm and that Ms. Giannone was sometimes at these dinners. Tanya testified that when Ms. Giannone was at the dinners, Ms. Giannone would have been the only one cooking. Id. at 119-120. Tanya testified the 'Prior Will History', under October 28, 2013's Will, 50% was to be bequeathed to Tecce Jr., 20% to Roseanna. Tanya confirmed in the June 2017 Will, which is the last Will which Mr. Tecce signed, he leaves Roseanna 40% of his estate, an increase of 20%. Id. at 19-26. Tanya testified that between 2013 and 2017 Mr. Tecce and Rosanna Giannone lived together under the same roof at Nicholas Avenue and Ms. Giannone was part of his care team and involved with the doctors. Id. at 26.

Tanya testified that Mr. Tecce kept diaries for years and testified that "My dad wrote down a lot of stuff, yeah". Id. at 27. Tanya testified that she took photos of Mr. Tecce signing a healthcare power of attorney in March of 2017 while he was in Moss Rehab. She testified that Mr. Tecce named her as his agent. Mr. Tecce prepared the handwritten version of the healthcare power of attorney by himself, that he was capable of preparing such documents, and that "he did it often". Id. at 33-34. Tanya testified that she had no doubt in her mind that Mr. Tecce understood the legal documents he was signing in March of 2017, just three months prior to the Will she is contesting. Id.

Tanya confirmed Mr. Tecce's diary entry on June 3rd & 4th stated "my daughter wanted me to cash a CD". See Exhibit P-4, page 163; Id. at 46. Tanya confirmed Mr. Tecce's diary entry from June 21, 2017 was in his handwriting which stated "my

7

daughter sent me a text full of lies blaming her failures on me. She needs professional help. Daughter is delusional." See Exhibit P-4, Id. at 63. Tanya confirmed Mr. Tecce's diary entry from June 26, 2017 was in his handwriting which stated "my daughter should declare bankruptcy. Daughter is delusional and lies" See Exhibit P-4, Id. at 64.

Tanya testified Mr. Tecce's diary entry from June 28, 2017 was in his handwriting which stated "Spoke with John Conner, attorney about changes to my will." See Exhibit P-4, Id. Tanya confirmed Mr. Tecce's diary entry from June 29, 2017 was in his handwriting which stated "I and Ro drove up to the Conner Law Group in Jenkintown, PA. Made justified changes to my will. Nice day, was nice to run my car. Paperwork in office." See Exhibit P-4, Id. Tanya testified that prior to seeing Mr. Tecce in the hospital in the last days of his life, the last time she saw him was at the house on Father's Day. Id. at 76-77.

Roseanne Giannone ("Ms. Giannone") was called to the stand on January 30, 2023 as an adverse party and testified has been retired since early 2017, right around the time Mr. Tecce's illness got worse. Id. at 78-80. Ms. Giannone testified prior to retiring, she owned a housecleaning business for about 10 years and lived with Mr. Tecce for about 18 years, around 2000. Id. at 80-81. Ms. Giannone testified that she has three of her own children, one of which is Matthew Ferragame, who Mr. Tecce named the Executor of the estate. Id.

Ms. Giannone testified that Mr. Tecce would introduce her as his wife in hospital settings, including his hospital visits in 2017, and she would speak to hospital staff from time to time on behalf of Mr. Tecce as his wife. Id. at 81-83. Ms. Giannone testified Mr. Tecce was in and out of the hospital three or four times during the winter and spring of

8

2017 and that Tanya Tecce and Tecce Jr. were also involved in Mr. Tecce's medical conditions, discussions with doctors, staying overnight at hospitals. Id. at 84-85. Ms. Giannone testified that she felt she "pretty much lived there" at the hospital and testified she was the predominant person at nights in the hospital. Id. at 85. Ms. Giannone testified Mr. Tecce was receiving chemotherapy in March of 2017, which caused congestive heart failure and breathing difficulties. Id. at 86. Ms. Giannone testified that, as she understood, the intravenous chemotherapy was stopped as a result of the congestive heart failure and Mr. Tecce was prescribed to receive a different chemotherapy medication in a pill form. Id. at 87. Ms. Giannone testified that Mr. Tecce was taking anti-anxiety medication from winter of 2017 through the spring of 2017. Id. at 88.

Ms. Giannone testified that she was not aware that Mr. Tecce kept a diary until after he passed and she was moving out of the house. She testified she did not read the contents of the diary, but recognized Mr. Tecce's handwriting and put it aside to give to the attorney. Id. Ms. Giannone testified she had not gone through the journal in detail ever. Id. Ms. Giannone testified that the journal appeared to be accurate, from what she had seen of it. Id. at 89. Ms. Giannone testified that she did not go through everything in the journal but confirmed that the journal's notations seemed to reflect Mr. Tecce's severe breathing difficulties. Id.

Ms. Giannone testified that in all the years she and Mr. Tecce were together, she did not want to know about his assets or wills. Mr. Tecce would start to talk to her about it, but she did not feel like it was her business. When Mr. Tecce would bring up the

9

topic, it was to discuss his will and how it read. Ms. Giannone testified "I did not want to talk about it. I didn't want to know anything about it." Id. at 90.

Ms. Giannone testified that she was present at Einstein Hospital when Mr. Tecce first called the attorney, Mr. Conner to schedule an appointment. Id. at 90-91. Ms. Giannone testified she was in and out of the hospital room when Mr. Conner came to meet with Mr. Tecce and testified Tecce Jr. and his wife were also present at that meeting. Id. at 91. Ms. Giannone testified she saw Mr. Conner take notes at the hospital and she was present when he returned with documents and that she was in and out during the meeting. Id. Ms. Giannone testified "the attorney brought a witness to – with him. I did not see the will. He signed it. It was put into an envelope, sealed, and given to Joe." Id at 92.

Ms. Giannone testified while Mr. Tecce was at home, there were family dinners on Sundays at their shared residence and Tanya would sometimes attend. Id. at 95-96. Ms. Giannone testified that in that time, everything appeared fine between Tanya and Mr. Tecce. Id. Ms. Giannone testified that after Mr. Tecce was discharged from Moss Rehab, Tanya would call her from time to time to discuss Mr. Tecce's health. Id. Ms. Giannone testified that if Mr. Tecce seemed a bit worse one day, she would let Tanya know. Id. at 97. Ms. Giannone testified she did remember Tanya's three sons visiting Mr. Tecce at Penn Hospital, but she was not sure if Tanya's three sons visited Mr. Tecce while at Moss Rehab or Einstein Hospital. Id. Ms. Giannone testified Mr. Tecce's grandsons were a positive aspect of his life during the spring of 2017. Id. Ms. Giannone testified that Mr. Tecce would mention his grandsons and the will, but "I would just tell him just do what you want to do. I didn't want to talk about a will." Id. Ms.

10

Giannone did not recall Mr. Tecce ever talking about what he wanted to do for his grandchildren specifically in March, April, or May of 2017. Id. Ms. Giannone testified that Mr. Tecce told her that he wanted to remove his grandchildren from his will. Id. at 97-98. Ms. Giannone testified Mr. Tecce made that statement after Father's Day. Id.

Ms. Giannone testified prior to Father's Day, she remembers Mr. Tecce experiencing occasional dizziness if he was getting up too quickly that would last a few seconds, but it was not a regular basis or case of Mr. Tecce walking around dizzy. Id. Ms. Giannone testified she did not witness Mr. Tecce doing business in May, June or April of 2017, but he would usually go down in the basement to do work and she would just stay upstairs doing chores. Id.

Ms. Giannone testified that the Nyack Corporation that Mr. Tecce owned also operated out of another house that Mr. Tecce owned. Id. at 98-99. Ms. Giannone testified that she believed Mr. Tecce would go to that office to work in April, May and June of 2017 as he liked to take his car out and testified that Tecce Jr. would be involved in the business with Mr. Tecce. Id. Ms. Giannone testified Mr. Tecce's brother, Vince, was involved in the business as well and testified he would come around their shared house to discuss business from time to time. Id.

Ms. Giannone testified Mr. Tecce's journal was located at the Nicholas property in Springfield and was within a box. Id. at 100. Ms. Giannone testified Mr. Tecce's journal was in the box that Mr. Tecce put important papers. She testified "I pulled the box out and I found the journals, and I put those aside. But I don't recall going through the box, like, you know, just seeing what's in there because I didn't know what should be in there anyway." Id. at 100-101. Ms. Giannone testified the June 2017 Will was

11

located by either Ferragame or Tecce Jr in the box. Id. Ms. Giannone testified the March 2017 Will was not in the box. Id.

Ms. Giannone testified that she does not recall Mr. Tecce talking about money, either his assets or his CDs, with his family at any of the family dinners. Id. Ms. Giannone testified she remembered driving Mr. Tecce to the bank once to empty out his safety deposit box. She further testified "if he cashed anything in there, I wouldn't have known about it because he didn't tell me... He was emptying it. That's all he said was that he was emptying his safety deposit box, and I waited in the car...whatever he took out of the safety deposit box, I never saw it so I don't know what was in there". Id. at 101-104. Ms. Giannone testified the only records of Mr. Tecce's legal documents would be what was in the box with the journal. Id. at 104. Ms. Giannone testified that Ferragame went through the box to see what he needed to take action on. Id.

Ms. Giannone testified that in 2017 Mr. Tecce did give her money because she wasn't working anymore and was looking after him. She had bills to pay and he wrote her a check. Id. Ms. Giannone testified she was contributing to the household expenses while she worked and testified she stopped contributing to the household expenses in January of 2017. Id.

Ms. Giannone testified that prior to March 2017, she had not been a witness to an argument between Mr. Tecce and Tanya. Id. Ms. Giannone testified that Mr. Tecce did not ever discuss with her any problems he has with his grandsons in 2017. Id. Ms. Giannone testified to not recalling Tanya telling her that Tanya wanted Mr. Tecce to cash in a CD and she did not "see" any changes in Tanya's demeanor towards Mr. Tecce until Father's Day, 2017. Id.

12

Ms. Giannone testified to seeing Tanya in early June of 2017 during a visit with Mr. Tecce where she had a lease in her hand. Ms. Giannone testified to speaking with Tanya about the lease privately before Tanya and Mr. Tecce had a chance to talk. Id. at 105-106. Ms. Giannone testified to being in for part of the conversation regarding the lease with Mr. Tecce and Tanya present. Id. at 106. Ms. Giannone testified that she could not venture a guess to how long Tanya was at the Nicholas Drive residence that day and testified that Mr. Tecce was upset. Id. Ms. Giannone testified she heard Mr. Tecce question Tanya regarding how much money she had in her bank account and heard Tanya's reply. Id. at 106-107.

Ms. Giannone testified that Mr. Tecce would confide in telling her how Tanya needed to help herself. Id. at 107. Ms. Giannone testified that Mr. Tecce would fairly consistently feel that way in his relationship with his daughter well before 2017. He would express disappointment in Tanya. Id. Ms. Giannone testified that Mr. Tecce would express disappointment in Tecce Jr to her as well. Id.

Ms. Giannone testified that Mr. Tecce and Tanya spoke over the phone after the lease conversation and she heard Mr. Tecce's portion of the conversation. Ms. Giannone testified that Mr. Tecce wanted to have that particular conversation face to face, but Tanya was unable to come over, so Mr. Tecce told Tanya on a phone call that he was not going to help her financially. Id. at 109. Ms. Giannone testified "The day that he called, he wanted her to come over to the house that day, which was – it was a Friday. He wanted her to come to the house and explain. And I guess Tanya wanted just for him to tell her what he decided, and that's when he told her that he decided that he wasn't going to give her the money. He needed it." Id.

13

Ms. Giannone testified Mr. Tecce needed the money due to being sick. Id. at 110. Ms. Giannone testified she did not know how much money Tanya was asking for. Id. Ms. Giannone testified that at the Father's Day argument "Tanya was upset and I guess it was about the fact that he [Mr.Tecce] wasn't going to give her money, and he – Tanya was – said, like, you know, you never did anything for me. I always had to do it for myself, and then the swearing started. Tanya was first, and then Joe [Mr. Tecce] came back at her. But he was clearly upset, I mean, really upset. ...Well, after she got in Joe's face and said ... 'Happy fucking Father's Day you asshole' and then left the room. She left, and Alex came back into -- he must have been in the powder room, and he asked were Tanya was, and I said that she was leaving. And so, he went outside and then came back in, and gave Joe a hug and said happy Father's Day. And then he left." Id. at 113-114.

Ms. Giannone testified the argument was quick, under a few minutes. Id. Ms. Giannone testified Mr. Tecce was visibly shaking and crying after Tanya left, and was concerned she might have to call the hospital, but after some time and taking a Xanax, he calmed down. Id. at 115. Ms. Giannone testified Mr. Tecce was still upset and angry the next day and remained angry. Id. at 115-116.

Ms. Giannone testified Mr. Tecce made the appointment with Mr. Conner to talk about the Will. She testified she went with Mr. Tecce as he drove his car to Mr. Conner's office for the purposes of changing the Will, specifically Tanya from the Will. Id. at 116. Ms. Giannone testified she could not recall if Mr. Tecce said he would remove the grandchildren from the will at that time. Id. Ms. Giannone testified that the days after the argument, all Mr. Tecce could talk about was removing Tanya from the

14

will and that Tanya needed professional help. Ms. Giannone testified she agreed with Mr. Tecce and said that back to him. Id. at 117.

Ms. Giannone testified she went into Mr. Conner's office, but was not there for the entirety of the meeting. Id. at 121. Ms. Giannone testified she remembered people going into Mr. Conner's office as witnesses when everything was ready to sign. Id.

Ms. Giannone testified that Mr. Tecce told her that Tanya was delusional and would say it fairly often. Id. at 121-122. Ms. Giannone testified that Mr. Tecce told her to block Tanya's phone number from the house and to not communicate with Tanya, even when Mr. Tecce's health had taken a severe turn for the worse. Mr. Tecce would say that Tanya could reach out to Tecce Jr. for any medical updates. Id.

Ms. Giannone testified that in late August/early September, Mr. Tecce went to Temple Hospital for major heart surgery and was in Harley Rehab in Springfield. Id. at 123. Ms. Giannone testified that Tanya was not provided with any information regarding Mr. Tecce's health and she testified "I asked him again when they were prepping him for surgery if he wanted Joe [Tecce Jr.] to let Tanya know, and he said she knows where she can reach her brother. And I didn't pursue." Id. at 123 -124.

Ms. Giannone testified Tanya was able to see Mr. Tecce in the last week of his life and testified "Well, I told Joe [Tecce Jr.] it was a good idea to get - - you know, to reach out to Tanya". Id. at 124.

Ms. Giannone testified in the week after Father's Day 2017 up to the time of the Will at Mr. Conner's office which removed Tanya from Mr. Tecce's estate, Mr. Tecce was angry with Tanya. Id. at 124-125. Ms. Giannone testified that Mr. Tecce would

15

communicate that Tanya was self-entitled and ungrateful and needed help and she would repeat it back to him. Id. at 125.

John Conner testified on April 21, 2023 as he was the scrivener and stated that he currently works as a program director for Praises to Cure, but prior to that was a licensed attorney in Pennsylvania and believed to have lost his license officially in 2019 or 2020. See Notes of Testimony, April 21, 2023 ("NT 4/21/23" at pg.13)

Mr. Conner testified he was disbarred, first on a temporary basis and then it became permanent as he was convicted in federal court, in front of a jury, of wire fraud and obstruction of justice. Id. at 14. Mr. Conner confirmed that his criminal conviction was due to using a client's credit card without her permission. Id. at 14- 16. Mr. Conner confirmed that his statements to federal agents is what lead the charges of obstruction to justice and he does not recall the amount of charges. Id. 17-18. Mr. Conner testified that the underlying crimes were committed from August of 2016 through May of 2017. Id. Mr. Conner confirmed that those crimes were committed during the same time that he was handling some of Mr. Tecce's affairs, in March and April 2017. Id. at 18-20. Mr. Conner confirmed that there was a gambling addiction which resulted in the usage of the credit card. Id. at 20.

Mr. Conner testified that his law office was at 766 Old York Road, Jenkintown, Pennsylvania in 2017 and he predominantly worked in criminal defense practice. He testified he did some personal injury law, as well as will and estate work. Id. at 21.

Mr. Conner testified "I don't have any notes from any files that I had while I was practicing law. It's been two, three years now. I don't have any from Mr. Tecce or for anybody else." Id at 23. Mr. Conner testified he did not destroy any file material for

16

Mr. Tecce, nor did he destroy any Wills for Mr. Tecce that would have been in his possession. Id. at 23-24. Mr. Conner testified he turned his entire file regarding Mr. Tecce to the Respondents' attorney. Id. at 24.

Mr. Conner testified that his practice, when preparing a will, would be to take notes. Id. Mr. Conner testified he did not recall where the March 2017 notes may have gotten and further stated "I'll just add that when I first met Mr. Tecce, It was at Einstein Hospital. That's the only time that I ever that I can recall meeting with someone outside of my office or outside of their residence. So, those circumstances were a little different than what usually happens, So, I would have taken some notes because I wouldn't have been able to remember everything that he was telling me that he wanted to include in the will. I do not remember specifically how in depth those notes were and I cannot remember specifically what I did with those notes after the will was prepared." Id. at 25-26.

Mr. Conner testified he did not recall where the June 2017 notes may have gotten and further stated "Mr. Tecce had sent me an email or fax basically telling me that he wanted to change his will and he also had faxed over documentation as to what changes he wanted to make. So, I actually did not see Mr. Tecce until he came into my office to sign the will that had been prepared." Id. Mr. Conner testified that he did not recall specifically and definitively taking notes at the June meeting. Id. at 26-27.

Mr. Conner testified the first time he met Mr. Tecce as an attorney was in March of 2017 and it was at the Einstein Hospital. Id. at 27. Mr. Conner testified he met with Mr. Tecce twice, a few days apart, at the hospital for the March 2017 will. Id. at 30.

17

Mr. Conner testified "My recollection is that on that first meeting Rose [Rowe] was there in the room when I first met him initially" and did not recall her being in the room the entire time or if there was any one else. Id. at 31. Mr. Conner testified "I don't know whether I asked her to leave the room or whether she left the room on her own, but my recollection is that when I began to talk to Mr. Tecce specifically about the will, what he wanted in the will, that conversation was between he and I." Id.

Mr. Conner testified that Mr. Tecce did explain the nature of his relationship with Ms. Giannone at that first meeting. Id. Mr. Conner testified that Ms. Giannone did not explain her relationship with Mr.Tecce. Mr. Conner testified Mr. Tecce identified Ms. Giannone as his girlfriend. Mr. Conner testified Mr. Tecce informed him that he had been married and had children from that marriage. Mr. Conner did not recall if he asked Mr. Tecce if he was divorced. Mr. Conner did not recall if Mr. Tecce said he had been widowed. Id. at 32-33.

Mr. Conner testified that he asked Mr. Tecce about his assets and Mr. Tecce said it was a private matter he did not want to discuss. Mr. Conner testified that he followed up explaining why he need to ask about the finances and Mr. Tecce continued to state that he didn't want to give Mr. Conner that information. Id. at 34. Mr. Conner testified that Mr. Tecce wanted a Will drafted. Id. at 34-35. Mr. Conner confirmed that a document marked as Last Will and Testament but was unsigned and dated in March 2017, was a Will that Mr. Conner drafted for Mr. Tecce. Mr. Conner confirmed that the dispositive scheme outlined in provisions A through E is what Mr. Tecce requested him to draft. Id. at 40-46. Mr. Conner testified that he told Mr. Tecce that all other prior wills of Mr. Tecce's would be revoked and Mr. Tecce understood. Id. at 48. Mr. Conner

18

testified he did not draft any power of attorney or living wills for Mr. Tecce. Id. at 49. Mr. Conner testified that on the second trip to the hospital, he brought along a notary to formalize Mr. Tecce's March 2017 will. Id. at 49-50. Mr. Conner testified to reviewing the document with Mr. Tecce in the hospital and the determination that Mr. Tecce was able to sign the document. Id. at 51.

Mr. Conner testified the second time he heard from Mr. Tecce was when "I remember I think receiving a phone call from him and this, I believe, would have been in June indicating to me that he was sending me over a fax and that he wanted to make changes to his will." Id. at 53. Mr. Conner testified that Mr. Tecce's tone in his phone call was "a normal conversation. He did not seem angry. He did not seem sad. He just seemed like he wanted to make some changes to the will that I prepared for him back in March and that he wanted those changes made as soon as possible. …and that he was faxing me over a copy of the changes that he wanted to make." Id. at 54.

Mr. Conner testified that he did receive the fax with Mr. Tecce's handwriting on it indicating what changes should be made. Id. at 56. Mr. Conner testified that he made the changes that Mr. Tecce indicated on the June 28, 2017 fax to the will, which was signed on June 29, 2017. Id. at 56-61. Mr. Conner testified "I know that I didn't just prepare the second will after receiving these two faxes. That I went over with him exactly what it was that he wanted, made sure I understood what he wanted, and I prepared the second will." Id. at 62. Mr. Conner testified that he likely spoke with Mr. Tecce twice on June 28th, once prior to getting the fax, and a second call to Mr. Tecce to further inquire about it. Id. at 63.

19

Mr. Conner testified that on the second call to Mr. Tecce, he wanted to clarify the "substantial changes in the way he wanted his estate distributed after his death" and that the Mr. Tecce confirmed when he "faxed over that top page with the handwriting in there letting me know that 'yes, I understand what you're saying to me and this is some of the reasons why I want to make those changes'." Id. at 64. Mr. Conner testified that he did not recall as to making inquiries as to why Mr. Tecce was making changes related to his grandchildren. Id. at 64-65.

Mr. Conner testified that for their first meeting with Mr. Tecce in March and at the hospital, Mr. Tecce was well articulated and expressed concern about his mortality. He conveyed a sense of urgency to get the will created. Mr. Conner's impression was that "his body was weak, but his mind was strong. He knew exactly what he wanted. He could articulate to me what he wanted and why." Id. at 65-66. Mr. Conner testified that Mr. Tecce was in better health when he saw him at his office for the drafting and signing of the June 2017 will. Id. at 67.

Mr. Conner testified that he had a conversation with Mr. Tecce regarding some of the challenges that could result from the June will and when Mr. Tecce "came in to sign it, he reiterated what he had put in this fax. That he had challenges with his relationship with his daughter and that's the reason why he wanted to make the changes in his will. ...Yes, it was urgent. He wanted to make sure that he took care of things that were concerning him at that time, in particular, how he wanted his estate divided." Id. at 67-68.

Mr. Conner testified that he and Mr. Tecce did discuss the Father's Day argument when he came to his office. Mr. Conner could not recall the specifics of the

20

argument but it was consistent with what was mentioned in the fax. He further testified that Mr. Tecce was not agitated. Id. at 68. Mr. Conner testified that Mr. Tecce seemed to care about Tanya, but was upset and disappointed and wanted to make sure she did not receive any of his estate. Id. at 69. Mr. Conner testified that Mr. Tecce stated Tanya needed professional help. Id.

Mr. Conner testified that he did not believe Mr. Tecce was under anyone's undue influence. Id. at 70. Mr. Conner testified that he did not believe Mr. Tecce was influenced by Ms. Giannone and her family because when Mr. Conner asked Mr. Tecce about the increase to the Giannone and Ferragame shares, Mr. Tecce's answers were consistent with what was in his fax. Id. at 70-71. Mr. Conner testified further stating "Mr. Tecce seemed strong. Mr. Tecce didn't seem to me at any point in time during the two times I met with him that he would be intimidated or unduly influenced by anybody. He was his own man. His body was beat up, but he was strong." Id. at 71. Mr. Conner testified that Ms. Giannone was at his office when Mr. Tecce came to sign the will on June 29, 2017. Id. Mr. Conner testified that removing a daughter and grandchildren did not seem unusual, "not under these circumstances". Id. at 72.

Mr. Conner testified that he did not recommend Mr. Tecce to receive a mental status exam prior to executing a will. Id. at 76. Mr. Conner testified that he advised Mr. Tecce to get rid of the March 2017 will since it was revoked by the June 2017 will. Mr. Conner testified that Ms. Giannone was not in the room when Mr. Tecce executed the June will. Id. at 78. Mr. Conner testified he did not inquire of Mr. Tecce whether Ms. Giannone had any influence on him in the decision to remove his daughter and grandchildren from his will. Id. at 81. Mr. Conner testified that prior to meeting with or

21

representing Mr. Tecce, he had never met Matthew Ferragame or Ms. Giannone or Tecce Jr., nor had he done any legal work for them. Id. at 84. Mr. Conner testified he was a practicing attorney for a little over 27 years and drafted about 24 wills a year on average, but some years as many as 60. Id at 85-86.

Mr. Conner testified that he had no doubt and "no question" that Mr. Tecce was acting of his free will when he executed the June 29, 2017 will, which is at issue in this case. Id. at 92. Mr. Conner testified that Mr. Tecce was business-like on the telephone call on June 28, 2017. Id. at 93. Mr. Conner testified Mr. Tecce wanted 40 percent of the shares to go to Ms. Giannone, and if she were to pass before him, her shares shall be divided equally between Mr. Tecce's estate and Ms. Giannone's grandchildren. Id. Mr. Conner testified the changes to the March will that resulted in the June will are that of a disinheritance of Mr. Tecce's daughter and her sons. Id. at 93-94. Mr. Conner testified that he did not order or suggest Mr. Tecce to take a mini mental status examination before he executed the June will "because it was not a doubt in my mind that Mr. Tecce knew exactly what he wanted to do." Id. 94. Mr. Conner testified he did not see any mention of Ms. Giannone's grandchildren in the March 2017 will and the first insertion is in the June 29 2017 will. Id. at 98.

Matthew Ferragame ("Ferragame"), the appointed administrator to the estate of Mr. Tecce testified on August 16, 2023. Ferragame testified that the papers were in a box in the kitchen when he arrived at the house. In the box, there were account statements, copy of the Will, and many duplicates of bank statements and possibly a deed to the house in Landsdowne [sp]. See Notes of Testimony, August 16, 2023 ("NT 8/16/23" at pg. 81-85). Ferragame testified the Will was a copy of the June 29, 2017. He

22

did not recall seeing copies of the March 2017 Will in the box, nor did he recall ever seeing the Will from March 2017. Id. at 85-86. Ferragame testified he did have discussions with Mr. Tecce in 2016 towards the end of the year. He was asked to be the executor when Mr. Tecce called him, and he agreed to be executor for Mr. Tecce. Id. at 86.

Ferragame testified he did not see any paperwork or copies of the Will until after his death. Ferragame testified upon Tanya filing a contest, he did not attempt to acquire any additional material from any other sources. Id. at 86-87. Ferragame testified that the journal of Mr. Tecce was in the box with other paperwork and testified did not bother to review the journal and "turned everything over to Mr. Conner right away because I needed some help." Id. at 88. Ferragame testified he did look at the handwriting in the journal during his first meeting with Mr. Conner. Id.

Ferragame testified he recognized the handwriting to be that of Mr. Tecce. He further testified he knew his handwriting from Christmas cards and such. Id. at 89. Ferragame testified that he had witnessed Mr. Tecce interact with his natural grandchildren and did not ever see any problems in Mr. Tecce's relationship with his natural grandchildren. Id. Ferragame testified that he had seen Mr. Tecce and Tanya interact. He testified that he walked in twice after something negative between the two had occurred, but he never witnessed anything in the moment. Id. at 93.

Mr. Joseph Tecce, Jr., ("Tecce Jr"), the son of Mr. Tecce and Tanya's brother, testified that he was aware of the argument between Mr. Tecce and Tanya on Father's Day, June 2017. He later found out the argument was over money. Id. at 94. Tecce Jr., testified that he spoke with his father regarding the argument from Father's Day, June

23

2017. Tecce Jr stated it was the following day that Mr. Tecce told him that Tanya wanted the first and last month's deposit on a house in Narberth, which he considered until finding out that her primary home in Clifton Heights was being foreclosed, which Tanya did not tell him about. She had been renting out her primary house and with that rent money, she was renting an additional apartment for herself in Wynwood. Mr. Tecce relayed he was upset that she had three properties and he didn't know. Tecce Jr stated that they [his father and sister] had the blowup at the Father's Day dinner. Id. at 99. Tecce Jr. testified he did not know the terms of how much money was owed or being asked, just that Mr. Tecce was concerned about her primary house and not doing her responsibilities. Id. Tecce Jr., testified he wasn't sure of the amount, but was aware the Mr. Tecce was concerned about Tanya's financial responsibility and would complain about Tanya wanting money from him, especially after that Father's Day. Id. at 100.

Tecce Jr. testified in 2017 he did see his father's health decline, as well as acknowledge the journal Mr. Tecce kept. Tecce Jr. further testified the handwriting in it is his father's and had reviewed it prior. Id. Tecce Jr., testified Mr.Tecce's journal kept tabs of his hospitalizations, medical conditions, and medications. Id. at 103 -104.

Tecce Jr., testified speaking occasionally with Tanya regarding Mr. Tecce's health. He testified she would visit Mr. Tecce in the hospital, sometimes spending the nights there in early 2017, but was not sure as to what extent Tanya participated with Mr. Tecce's healthcare in 2017. Id.

Tecce Jr., testified that he did not observe Ms. Giannone attempt to restrict him from seeing Mr. Tecce on or around Mother's Day 2017, nor does he recall Ms. Giannone telling him or Tanya to stay away on Mother's Day 2017. Id at 107 – 108.

24

Tecce Jr testified that he was never told by Ms. Giannone that Tanya was not allowed to see Mr. Tecce. Id. at 109.

Tecce Jr. testified that he was present on Father's Day 2017 and witnessed three to five minutes of it in which he heard Tanya curse, but Mr. Tecce did not curse and after the Father's Day 2017 argument, Tanya left with Alex, Tecce Jr's nephew. Mr. Tecce was upset and had tears coming out of his eyes and visibly shaking. Id. Tecce Jr. testified that after the Father's Day 2017 argument, he was concerned for Mr. Tecce's medical condition and did not want to see him get any worse as he was stressed out. Id. at 110. Tecce Jr. testified he and his wife stayed at the house for at least an hour or two after and then left Mr. Tecce and Ms. Giannone for the day. Id. at 111. Tecce Jr. testified that he saw Mr. Tecce throughout the week and Mr. Tecce remained upset, specifically with Tanya. Id.

Tecce Jr., testified that after Mr. Tecce passed, the box with papers from Mr. Tecce's room was moved into the kitchen. Id. at 112. Tecce Jr., testified at that point he went through the box, as well as Mr. Conner's office. Id. Tecce Jr., testified he did not specifically see a Will in that box, as he only looked at it after litigation started, and the Will had already been processed. Id. Tecce Jr. testified he never saw any Will from Mr. Tecce prior to litigation. Id. at 112-113.

Tecce Jr., testified after Father's Day 2017, Tanya never reached out about Mr. Tecce's health, but he informed her when Mr. Tecce was at Fitzgerald [Hospital] in late September, which were Mr. Tecce's final days. Id. Tecce Jr., testified that he was at the hospital when Tanya arrived and Mr. Tecce was not glad to see her and he was unable to express any affection. Id. 113-114.

25

Tanya Tecce was recalled to testify and stated she had celebrated Mother's Day 2017 with her sons and Mr. Tecce in Springfield. She could not recall if her brother, Tecce Jr, had stopped by or not that day. Id. at 115-116. Tanya testified on Mother's Day 2017 she received a voicemail in the morning from Tecce Jr regarding seeing Mr. Tecce. Id 117.

Tanya played the voicemail from her phone which Tecce Jr relays that 'Rowe' and Mr. Tecce do not want all day company, but they "can [visit] for a little bit, and then leave him alone....maybe we can go see him between, you know, noon and 1:00 or something, before you go to Christine's." and Tecce Jr., stated in the voicemail that Mr. Tecce 'looked drained' when he saw him on that Friday. Id. at 118-119. Tanya testified, after the message was played for the first time for all parties to hear, that the message relayed that Ms. Giannone did not want them over the house too long. Id. Tanya testified "It sounded like she was trying to control the timeframe". Id. Tanya testified "she didn't say anything in the voicemail" when asked if Ms. Giannone said anywhere in the voicemail to not come. Id. at 120.

**ISSUES ON APPEAL**

1. The Court committed an error of law and/or abused its discretion when it granted Objections to Appellant's Notice of Intent to Serve Subpoena on December 1, 2022, based solely upon Appellant not filing a response to the Objections.

2. The Court committed an error of law and/or abused its discretion when it denied Appellant's Petition for Reconsideration/Motion *Nunc Pro Tunc* on January 6, 2023.

26

3. The Court committed an error of law and/or abused its discretion when it sustained the Estate's objection to the qualifications of its medical expert, Terrance Baker MD as to the Decedent's weakened intellect.

4. The Court erred when it granted the Estate's oral motion for non-suit when Appellant had shown clear and convincing evidence of both direct and indirect undue influence.

## DISCUSSION

In a will contest, the hearing judge determindes the credibility of the witnesses. *In re Estate of Nalaschi, 90 A. 3rd 8,11 (Pa. Super. 2014).* The record is to be reviewed in the light most favorable to the appellee, and review is to be limited to determining whether the trial court's finds of facts were based on legally competent and sufficient evidence and whether there is an error of law or abuse of discretion. Id. *Only where it appears from a review of the record that there is no evidence to support the court's finding or that there is a capricious disbelief of evidence may the court's findings be set aside.* Id.

## 1 and 2.  The Orphans' Court properly Sustained the Objections to Appellant's Notice of Intent to Serve Subpoena and properly denied the Motion for Reconsideration/Nunc pro tunc.

The ruling was based on the fact that the Trial had begun and pursuant to the Orphans' Court Trial Order of June 1, 2022, all discovery was to be concluded no later than one week before the November 1, 2022 Trial, which would be October 25, 2022.  To not sustain the Objections would have been an unfair prejudice to the Respondents in this matter and not in compliance with the Trial Order.

27

This matter was originally scheduled for Trial for August 3, 2022 wherein all discovery would have been concluded by July 27, 2022. Ample time was afforded both parties to be prepared for Trial.

The Pennsylvania Rule of Civil Procedure to which the Appellant refers is a Discovery Rule. By the time that the Subpoena could possibly have been effectuated, the Discovery deadline pursuant to the Trial Order would have terminated. Pennsylvania Rules of Civil Procedure, 4009.21, Subpoena Upon a Person Not a Party for Production of Documents and Things. Prior Notice. Objections., is the authority regarding the Notice and Objections.

Since the Trial had begun, the afore cited Discovery Rule is therefore not applicable. In Appellant's Motion for Reconsideration/Nunc pro tunc, Appellant has argued that a Motion needed to be filed before ruling on the Objections. The Orphans' Court notes that Respondent's Wherefore clause specifically asks for the Court to respond. The Orphans' Court did wait twenty days before issuing its decree of December 1, 2023.

Furthermore, over a month had passed by the time Appellant filed its Motion for Reconsideration/Nunc pro tunc. As previously stated, the Trial had begun on November1, 2023. The next scheduled hearing was for January 30, 2023. To have granted Reconsideration/Nun pro tunc would have been would have even more unfairly prejudicial to the Respondent. To be fair to both parties, the litigants should know what the parameters are for the Trial.

For the foregoing reasons, these Issues are without merit.

**3. The Orphans' Court properly excluded the evidence and testimony of Appellant's medical expert Terrence Baker, MD., as he did not have any direct contact or insight to decedent competency as to whether or not decedent was subject to undue influence**

"[I]t is well settled that the admissibility of evidence is a determination left to the sound discretion of the trial court, and it will not be overturned absent an abuse of discretion or misapplication of law." *Re Est. of Maddi*, 167 A.3d 818, 826 (Pa. Super. Ct. 2017). "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Pa. R.E. 401. In certain cases, evidence is irrelevant because the proponent fails to connect it to the time of the critical events. *Stotz v. Shields*, 696 A.2d 806 (Pa. Super. Ct. 1996).

*[T]he capacity of the testator at the time of the execution of the will* is the decisive and focal point of the inquiry." *Williams v. McCarroll*, 97 A.2d 14, 16 (Pa. 1953); (*emphasis in original*); *In re Snyder's Estate*, 123 A. 663, 667 (Pa. 1924); *In re Kane's Estate*, 55 A. 917, 918 (Pa. 1903) (finding that the condition of the testator's mind at the date of the will is the crucial question and that all testimony on other points is relevant and material only so far as it bears on this.).

It is well established that opinion evidence of medical experts is of little weight against the direct factual evidence of the scrivener and the subscribing witnesses, and should be entirely disregarded when contrary to established facts (i.e. established by

29

credible testimony) revealing mental capacity. *In re Cookson's Estate*, 188 A. 904, 908 (Pa. 1937); *In re DeMaio's Estate*, 70 A.2d 339, 340 (Pa. 1950) (finding that the physicians' testimony had little or no value who saw the testator on one occasion or not at all in view of the testimony of the witnesses who were present when the will was executed).

Although the Orphans' Court has greater latitude regarding the timing of the testator's medical evaluation in a case of undue influence as compared to a case of testamentary capacity, the Appellate Courts will not revisit the Orphans' Court's conclusions if its decision rests upon legally competent and sufficient evidence. *Owens v Mazzei,847 A.2d 700,707 (Pa. Super.Ct. 2004), In re Fritts Estate,906 A.2d 601,607 (Pa. Super. Ct. 2006).*

The Appellate Courts have previously addressed the relevancy and the weight to be given to an expert's medical opinion relative to the time of the will's execution and the evidence presented by disinterested witnesses. *See McCarroll, supra.*

In *McCarroll, supra*, the Supreme Court held that the contestants' evidence was insufficient to justify the jury's verdict that the will was obtained by undue influence of the testator's nephew. 97 A.2d at 15. The testator executed his will on February 9, 1945. *Id.* at 15. On the date of the Will's execution, the testator, in *McCarroll, supra*, had a certificate from his physician, whom he saw every two weeks over a four year period, certifying that the testator had the mental capacity to execute a will. *Id.* at 16-17. On February 9th, the testator met with the attorney privately; discussed his wishes as to the contents of the will; and executed the will. *Id.* at 16-17. At trial, the attorney testified that the testator was of "perfectly sound and disposing mind." 97 A.2d at 18.

30

The contestants, in *McCarroll*, presented evidence from two physicians who saw the testator five months after he made the will and concluded that he was incapable of making a will because he was suffering from dementia caused by arteriosclerosis. 97 A.2d at 15-16. However, the physicians admitted that it was possible for a person with dementia could have lucid intervals. *Id*.

The *McCarroll* Court found that the medical testimony presented from the contestants concerning with the deceased's condition more than five months after the date of execution to be vague and speculative as to the decedent's condition on the date of execution. *Id*. at 18. The *McCarroll* Court found that the proponents of the will produced many disinterested witnesses who had more frequent contacts with the testator and observed him nearer to the date of the will's execution, who without exception, expressed their opinion that the testator was of sound and disposing mind, including the testator's attorney's opinion, which was found to be strong and convincing. *Id*. at 16, 18. The *McCarroll* Court found that the testimony from the contestant's disinterested witnesses failed to indicate what the testator's condition of mind was on the date of the will's execution. *Id*. at 18.

As undue influence is "the gradual, progressive inculcation of a receptive mind," the relevant period of time still remains prior to and on the date of the 2017's Will execution. The evidence presented from those credible witnesses who had more frequent contacts with Decedent than Dr. Baker regarding Decedent's mental capacity prior to and on the date of the will's execution speaks to the contrary. *In re Clark's Estate*, 334 A. 2d, 628(1975), *Inre Estate of Smaling*, 80 A. 3d 485,498 Pa. Super. Ct. (2013, *In re Mampe*, 932 A. 2d 934, 961 (Pa. Super. Ct.) 2007.

31

The testimony of John Connor, who was the scrivener of the Will, who is a disinterested witness, corroborated Giannone's testimony as to Decedent's mental capacity. Like the testator's attorney in *McCarroll*, John Connor credibly and convincingly testified, in great detail, that during his representation of Tecce prior to and on the date of the June 2017 Will's execution, that Decedent showed no signs of weakened intellect, including manifestations of confusion, forgetfulness or disorientation; appeared to be of sound mind; and was able to understand completely and freely what he was doing. N.T. 4/21/23 at 67 -71.

Any expert opinion testimony that Dr. Baker would have offered as a fact and/or an expert witness would not have been relevant to the Orphans' Court's determination as to whether Decedent had a weakened intellect because Dr. Baker never examined Decedent. Therefore, the Orphans' Court properly excluded Dr. Baker's proposed testimony and proffered Expert Report. *See* Pa. R.E. 701, 702.

### 4. Appellant has failed to show any clear and convincing evidence of both direct and indirect undue influence.

Appellant argued that the Orphans' Court failed to apply the full and correct legal standard when granting the oral motion for non-suit. To set forth a *prima facie* case for undue influence, one challenging the validity of a will must demonstrate the following: (1) there was a confidential relationship between the proponent and testator; 2) the proponent receives a substantial benefit under the will; and 3) the testator had a weakened intellect. *In re Ziel's Estate*, 359 A.2d 728, 734 (Pa. 1976). Once each of these elements is shown by clear and convincing evidence, the burden shifts to the proponents of the will to refute the charge of undue influence. *Id.* "The word 'influence' does not refer to any and every line of conduct capable of disposing in one's favor a

32

fully and self-directing mind, but to control acquired over another that virtually destroys his free agency." *Id.*; *Paolini Will*, 13 Fiduc. Rep.2d 185, 186 (1993).

"In order to constitute undue influence sufficient to void a will, there must be imprisonment of the body or mind ... fraud, or threats, or misrepresentations, or circumvention, or inordinate flattery or physical or moral coercion. To such a degree as to prejudice the mind of the testator, to destroy his free agency and to operate as a present restraint upon him in the making of a will." *Ziel, supra* at 733; *Paolini, supra.*

The test is whether the record supports that on the day the Will at issue was executed, the testator had a "full and intelligent knowledge of the act he was engaged in, a full knowledge of the property he possesses, an intelligent perception and understanding of the disposition he desires to make of it, and of the person and objects he desires to be the recipients of his bounty." *Paolini, supra* at 188 (*citing In re Snyder's Estate*, 123 A. 663, 664 (Pa. 1924)); *See also Ziel, supra* at 731.

"The draftsman of a will, especially if he be a lawyer, is always an important and usually the most important witness in a contested will case and where he knew the testator prior to the execution of his will, ... his testimony showing voluntary and intelligent action by the testator, makes out a *prima facie* case that requires very strong evidence to offset it." *Paolini, supra* at 188.

There is not "a bright-line test by which weakened intellect can be identified to a legal certainty." *Owens, supra.* When the Pennsylvania Courts have found weakened intellect, it is usually marked by "persistent confusion, forgetfulness, and disorientation." *Id.*; *Nalaschi, supra* at 15; *Fritts, supra.* "The Orphans' Court mandate in assessing

33

such evidence is relatively broad." *Owens, supra.* "If the [Orphans' Court's] decision rests upon legally competent and sufficient evidence, [the Appellate Court] will not revisit its conclusions." *Id.* "Under no circumstances will [the Appellate Court] substitute [its] judgment of credibility for that of the Orphans' Court." *Id.*

"Contradicted testimony of occasional confusion of lapses of memory" by the testator does not amount to "clear and convincing evidence of the weakened mental condition of the testator." *Ziel, supra* at 733-734. Furthermore, evidence of physical illness or infirmity does not constitute evidence of weakened intellect. *In re Gold's Estate,* 182 A.2d 707, 713 (Pa. 1962) (holding that "there was no evidence of weakened intellect on the part of the testator at the time she executed this will" because the evidence showed "only that the testator suffered various physical infirmities.").

"[I]n no way does 'old age, sickness, disability or debility of body give rise to a presumption of incapacity." *In re King's Estate,* 87 A.2d 469, 473 (Pa. 1952). "Neither old age, nor its infirmities will deprive a person of his right to dispose of his property where he has command over his faculties." *In re Higbee's Estate,* 75 A.2d 599, 600 (Pa. 1950). Failure of memory does not prove incapacity, unless it is total or so extended as to make incapacity practically certain. *In re Conway's Estate,* 366 Pa. 641, 645 (Pa. 1951).

> A testator may not be able at all times to recollect the names of persons or families of those with whom he has been intimately acquainted. He may ask idle questions, and repeat himself, and yet his understanding of the ordinary transactions of his life may be sound. He may not have the strength and vigor of a man able to digest all the parts of a contract, yet he may be competent to distribute his property by will.

34

*Id.; See also In re Devereux's Estate,*18 Pa. D. & C. 289, 291-293, 300 (Pa. Orph. Ct. 1933) (declining to find weakened intellect even though there was testimony that the testator was "confused," "could not form a sentence," had several delusions, "could never hold a conversation with anybody," and "had a poor memory" and the wife of the will contestant testified that the testator "could not hold a conversation with her," did not respond to her questions, and could not "understand what was said.").

As to the lack of weakened intellect, the facts in *Ziel, supra* and *Paolini, supra* are analogous to the facts in this matter. In *Ziel,* the Supreme Court held that the evidence as to the testator's occasional confusion or lapses of memory failed to prove by clear and convincing evidence that (1) the testator executed the will and codicils with a weakened intellect and (2) the testator's sister who received a substantial benefit under these documents exerted undue influence upon him while she lived with the testator for nearly four years prior to his death. 359 A.2d at 731, 734. The *Ziel* Court found that the evidence supported that the decedent was well aware of the extent of his property and was active in handling his business affairs; and therefore, the orphans' court was "entirely justified in concluding that the contestant's evidence does not demonstrate convincingly that the decedent was subject to any overmastering influence by [the sister.]" *Id.* at 734.

The contestant's doctor, in *Ziel,* who had examined the testator on several occasions, testified that he last examined the testator sixteen months before the date of the will's execution. 359 A.2d at 732. The contestant's doctor further testified that at this time, the testator "was confused but not totally disoriented." *Id.* Another doctor offered by the contestant, who saw the testator multiple times, testified that he

35

examined the testator from seven months before the will's execution to fourteen months after the will's execution. *Id.* The second doctor testified that one could tell on these occasions that the testator was "not himself" and that during some visits, the testator "was uncooperative and disoriented." *Id.* The second doctor acknowledged that there were times when he was not so much confused and times when he was quite cooperative. *Id.*

The attorney, in *Ziel,* testified unequivocally that the decedent was mentally competent at the times the documents were executed and, indeed, was active in their preparation and revision. 359 A.2d at 732. The attorney further testified that his client, the decedent, knew exactly what he wished to do with his property and that it was he who suggested revisions in the documents in order that his purposes might be better effectuated. *Id.* The decedent's sisters and the attorney's wife all testified that the decedent was alert and normal on the respective dates of execution of the will and the two codicils. *Id.*

The contestant, in *Ziel,* testified that he saw the decedent only infrequently in the relevant time period and that the decedent was completely incapable of handling his own affairs and failed to recognize him on a number of occasions. 359 A.2d at 732. However, the *Ziel* Court noted that despite his misgivings about the decedent's mental condition, the contestant accepted a $5,000 gift from the decedent and a transfer of a joint savings account having a balance of $11,700. *Id.* at 733. The contestant's wife, testified that when she saw the testator a year before the will's execution and thirteen months after the will's execution, he did not recognize her. *Id.*

However, the will proponents, in *Ziel,* testified that the testator recognized both

36

the contestant and his wife on those occasions and that the testator "was alert and normal on the respective dates of the execution of the will and the two codicils." 359 A.2d at 732. In addition, the will proponents presented testimony from a disinterested police chief and a disinterested neighbor who both described the testator as "a little confused" and the police chief testified that the testator had wandered off and had to be escorted back to his house by the police. *Id.* at 733, n. 5.

In *Paolini, supra*, the Orphans' Court held that the will at issue was not obtained by undue influence exerted upon the testator by the proponents, the testator's housekeeper/companion and the testator's grandchild. 13 Fiduc. Rep.2d at 194-195.

The Orphans' Court, in *Paolini*, concluded that the contestants failed to prove by clear and convincing evidence that (1) the testator had a weakened intellect and (2) although they would receive a substantial benefit under the will if deemed valid, the proponents did not have a confidential relationship with the testator. *Id.* There was no dispute that the proponents stood to substantially benefit if the will was deemed valid. *Id.* at 185, 187.

The testator's attorney, in *Paolini*, who wrote the will testified that three months prior to the will's execution, he had several contacts with the testator and was able to ascertain the testator's mental state. *Id.* at 188. The attorney testified that the disposition of the testator's estate comported with what the testator expressed to him on several occasions and that the testator was competent when he executed his will. *Id.* Under the terms of the will, the contestants, including his daughter and son-in-law, received a $1.00. *Id.* at 185. The attorney testified that the testator informed him that he did not want to have any connection with them or have any other contact with them

before or after his death. *Id.* at 189. The subscribing witnesses both testified that on the date of the will's execution, that the testator neither did nor said anything that would cause either of them to question his mental capacity. *Id.* at 188.

The Orphans' Court, in *Paolini*, found that the contestant failed to prove the testator as both a physically and mentally disabled, feeble man suffering from a chronic alcohol problem. *Id.* at 189. The Record, in *Paolini*, was replete with events surrounding the date of the will's execution, wherein the contestant admitted that the testator was competent, such as taking him to the bank to transfer the title to certain certificates of deposit to his name and that of the contestant's; to execute a power of attorney naming her as its agent; and to sign a trust instrument settling a lawsuit against her and her husband. *Id.* at 190. The contestant never testified that the testator suffered from any mental impairments. *Id.*

The testator's treating physician and the psychiatrists offered by the proponents, in *Paolini*, concluded that the testator was not suffering from a weakened intellect and was showing normal aging signs of an 83 year old man. *Id.* at 190, 194. The testator's treating physician testified that a month before the will's execution, the testator did not have any short or long term memory loss and found his reasoning and judgment to be quite sound and that he appeared totally in control. *Id.* at 194. The psychiatrists who testified on behalf of the contestant never talked, examined, or treated the testator during his lifetime. *Id.* at 193. The psychiatrists never consulted with nor requested medical records from the testator's treating physicians. *Id.*

As to John Connor's testimony regarding Decedent's mental capacity, John Connor testified that his impression of the Decedent in March of 2017 was that he was

38

weak physically, but was strong mentally. He further stated that he got the same impression of Decedent in June. John Connor stated as follows:

"Matter-of fact, he was doing a lot better physically because when he came to my office to sign that will, he looked good physically but he was still strong. He was strong mentally and he was able to articulate to me what he wanted and why he wanted it done." N.T. 4/21/23 at 67.

Mr. Conner testified that he had a conversation with Mr. Tecce regarding some of the challenges that could result from the June 2017 Will and when Mr. Tecce "came into sign it, Mr. Tecce reiterated what he had put in his fax. That he had challenges with his relationship with his daughter and that's the reason why he wanted to make the changes in his Will. ...Yes, it was urgent. He wanted to make sure that he took care of things that were concerning him at the time, in particular, how he wanted his estate divided. Id. at 67-68.

Mr. Connor testified that Mr. Tecce seemed to care about Tanya, but was upset and disappointed and wanted to make sure she did not receive any of his estate. Id. 69. Mr. Connor testified that Mr. Tecce stated Tanya needed professional help. Id.

Mr. Connor testified that he did not believe Mr. Tecce was under anyone's undue influence. Id at 70. Mr. Connor testified that he did not believe Mr. Tecce was influenced by Ms. Giannone and her family because when Mr. Conner asked Mr. Tecce about the increase to the Giannone and Ferragame shares, Mr. Tecce's answers were consistent with what was in his fax. Id. at 70-71. Mr. Connor further stated "Mr. Tecce seemed strong. Mr. Tecce didn't seem to me at any point in time during the two times I

39

met with him that he would be intimidated or unduly influenced by anybody. He was his own man. His body was beat up, but he was strong.". Id. at 71.

Like the attorneys in Ziel and Paolini, John Connor had sufficient evidence to conclude that Decedent had the necessary testamentary capacity to enter and execute the June 2017 Will because Decedent (1) fully and intelligently knew that act that he was engaging in at that time, (2) fully knew what property he possessed and intelligently appreciated and understood what property he wanted to give to certain persons. Id. 67-71. John Connor concluded that not only did Decedent have testamentary capacity to enter and execute the June 2017 Will but also, was not under the subject of undue influence by anyone and therefore, the June 2017 Will was valid. Id; Ziel, supra at 733; Paolini supra at 188.

Tanya 's only testimony regarding this issue was that Mr. Tecce was misspelling a lot of words and used wrong grammar and that he usually did not make mistakes like that. N .T. 11/1/22 at 75-76.

The following three cases illustrate when there is clear and convincing evidence of weakened intellect of the testator: Clark, supra at 633; Smaling, supra.; and Mampe, supra. In all three of these cases, the testator exhibited signs of "persistent confusion, forgetfulness, and disorientation" prior to the execution of the will, such as an inability to manage one's affairs, to recall distant matters from the past while being unable to absorb current matters, to recognize family members, or to know the value of anything he/she owned. Id. In addition, the testator, in each of these cases, was diagnosed with hardening of the arteries, dementia or Alzheimer's Disease prior to the execution of the will. Id.

40

The facts, in this matter, are clearly distinguishable from the facts in *Clark, supra; Smaling, supra; and Mampe, supra.* Unlike the testators in these cases, the Record is devoid of any evidence that Decedent was ever diagnosed with cerebral arteriosclerosis, dementia, or Alzheimer's Disease prior to the June 2017 Will's execution. Unlike the testators in these cases, there was no evidence presented that Decedent was in a state of persistent confusion, forgetfulness, or disorientation. Unlike the testators' behavior in these cases, there was no evidence presented that Decedent was unable to manage his affairs, was not oriented to place and time, or did not know the value of anything he had. Upon review of all the evidence presented, none of the witnesses, not even Tanya, testified about such behavior by Decedent as set forth in these cases. The evidence in this matter speaks quite to the contrary, including the evidence presented by Tanya.

As to the existence of a confidential relationship between Decedent and Giannone there was a lack of clear and convincing evidence presented that such relationship existed. A confidential relationship exists between a testator and another person when the testator has reposed a special confidence over the other person to the extent that the parties do not deal with each other on equal terms, either because of an overmastering dominance on one side, or weakness, dependence, or justifiable trust, on the other thereby resulting in such a disparity in the position that the testator places complete trust in the other party's advice and seeks no other counsel, so as to give rise to a potential abuse of power. *Fritts, supra* at 608; *King, supra* at 472; *Paolini, supra* at 195.

"A confidential relationship is a somewhat amorphous concept that 'cannot be

41

reduced to a catalogue of specific circumstances,'..., and thus, 'each case must be analyzed on its own facts.'" *In re Scott's Estate*, 316 A.2d 883, 885 (Pa. 1974). "Dependency does not necessarily beget a confidential relation, - indeed, it may be quite the reverse. Nor do kindness and nursing services give rise to a confidential relationship." *Paolini, supra* at 196. In this matter, there is a lack of clear and convincing evidence that Decedent and Giannone had a confidential relationship.

It is clear from the June 2017 Will, that Tanya has been disinherited. Therefore, Giannone does receive a substantial benefit. So The Orphans' Court recognizes that Tanya, as Decedent's daughter, is upset with the provisions of the June 2017 Will. However, "a parent owes no obligation to his children to leave them property." *Paolini, supra* at 196. Without clear and convincing evidence that undue influence existed, the Orphans' Court must honor Decedent's voluntary decision regarding the June 2017 Will.

John Connor, the June 2017 Will's Scrivener, provided extremely thorough, consistent, and credible testimony that in no way Decedent had "persistent confusion, forgetfulness, and disorientation;" and therefore, suffered from a weakened intellect. According to John Connor, Decedent knew what he wanted to do as to the June 2017 Will, and adamantly told him exactly what he wanted to do with his property regarding Ms. Giannone and his daughter Tanya.

Motions for Nonsuit are under the authority of the Pennsylvania Rules of Civil Procedure 230.1 and PA ST 20 Pa.C.S.A. section 779. As to the propriety of the granting of a nonsuit , the standard of review in determining the propriety of the entry of a non-suit is well settled:

"[Entry] is proper only if the factfinder, viewing all the evidence in favor of the

42

plaintiff, could not reasonably conclude that the essential elements of a cause of action have been established. When a nonsuit is entered, the lack of evidence to sustain the action must be so clear that it admits no room for fair and reasonable disagreement."

Billing v. Skvarta, 853 A. 2d 1042 (2004), citing Joyce v. Boulevard Therapy & Rehab. Ctr., P.C., 694 A 2d 638 (Pa. Super. 1997).

In granting Appellee's Motion for Non-suit, the Orphans' Court has found that the Appellant failed to establish a prima facie case for undue influence. As stated previously one challenging the validity of a will must demonstrated that (1) there was a confidential relationship between the proponent and testator; (2) the proponents received a substantial benefit under the will; and (3) the testator had a weakened intellect. Ziel supra. Appellant failed to show that Decedent exhibited any of the factors of a person with a weakened intellect or the Giannone had a confidential relationship with Decedent. Therefore, this issue is without merit.

## CONCLUSION

For the aforementioned reasons, the Orphans' Court respectfully requests that its Decision be **AFFIRMED**.

_____
**KATHRYNANN W. DURHAM, J.**

43